# WOLSTON *v.* READER'S DIGEST ASSOCIATION, INC.,
## ET AL.

No. 78–5414.   Argued April 17, 1979—Decided June 26, 1979

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Powell, and Stevens, JJ., joined. Blackmun, J., filed an opinion concurring in the result, in which Marshall, J., joined, *post*, p. 169. Brennan, J., filed a dissenting opinion, *post*, p. 172.

*Sidney Dickstein* argued the cause for petitioner. With him on the brief were *George Kaufmann* and *Leslie J. Ruben.*

*John J. Buckley, Jr.,* argued the cause for respondents.

With him on the brief were *Edward Bennett Williams* and *David Otis Fuller, Jr.*†

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

In 1974, respondent Reader's Digest Association, Inc., published a book entitled KGB, the Secret Work of Soviet Agents (KGB), written by respondent John Barron.[1] The book describes the Soviet Union's espionage organization and chronicles its activities since World War II. In a passage referring to disclosures by "royal commissions in Canada and Australia, and official investigations in Great Britain and the United States," the book contains the following statements relating to petitioner Ilya Wolston:

> "Among Soviet agents identified in the United States were Elizabeth T. Bentley, Edward Joseph Fitzgerald, William Ludwig Ullmann, William Walter Remington, Franklin Victor Reno, Judith Coplon, Harry Gold, David Greenglass, Julius and Ethel Rosenberg, Morton Sobell, William Perl, Alfred Dean Slack, Jack Soble, *Ilya Wolston,* Alfred and Martha Stern.*

> "*No claim is made that this list is complete. It consists of Soviet agents who were convicted of espionage or falsifying information or perjury and/or contempt charges following espionage indictments, or who fled to the Soviet bloc to avoid prosecution. . . ." App. 28 (emphasis supplied).

In addition, the index to KGB lists petitioner as follows: "Wolston, Ilya, Soviet agent in U. S." *Id.,* at 29.

Petitioner sued the author and publishers of KGB in the United States District Court for the District of Columbia,

---

†*Richard M. Schmidt, Jr.,* filed a brief for the American Society of Newspaper Editors et al. as *amici curiae* urging affirmance.

[1] Respondents Bantam Books, Inc., MacMillan Book Clubs, Inc., and Book-of-the-Month Club, Inc., are subsequent publishers of KGB under contractual arrangements with Reader's Digest.

claiming that the passages in KGB stating that he had been indicted for espionage and had been a Soviet agent were false and defamatory. The District Court granted respondents' motion for summary judgment. 429 F. Supp. 167 (1977). The court held that petitioner was a "public figure" and that the First Amendment therefore precluded recovery unless petitioner proved that respondents had published a defamatory falsehood with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not," *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 280 (1964). 429 F. Supp., at 172, 176. While the District Court agreed that the above-quoted portions of KGB appeared to state falsely that petitioner had been indicted for espionage, it ruled, on the basis of affidavits and deposition testimony, that the evidence raised no genuine issue with respect to the existence of "actual malice" on the part of respondents. *Id.,* at 180–181. The Court of Appeals for the District of Columbia Circuit affirmed. 188 U. S. App. D. C. 185, 578 F. 2d 427 (1978).[2]

---

[2] Both the District Court and the Court of Appeals rested their decisions on the First Amendment to the United States Constitution. The District Court commented in a footnote that it "might also have decided to apply the actual-malice standard in this case on the ground that the law in the District of Columbia requires it." 429 F. Supp., at 178–179, n. 37. The court referred to an unpublished decision of the Superior Court of the District of Columbia as support for that proposition. *Hatter* v. *Evening Star Newspaper Co.,* Civ. No. 8298–75 (Mar. 15, 1975). But the Court of Appeals in a footnote to its opinion cast substantial doubt on the correctness of the District Court's comment. See 188 U. S. App. D. C., at 193 n. 3, 578 F. 2d, at 435 n. 3. It described *Hatter* as "a brief unpublished order which recited several other grounds for granting summary judgment" and which cited no District of Columbia authority, and it noted that subsequent to the District Court's decision, another judge of the District of Columbia Superior Court had "filed an elaborate opinion which concluded to the contrary that in the District a newspaper may be liable for actual damages suffered by a private person if it negligently publishes defamation, without actual malice." 188 U. S. App. D. C., at 193 n. 3, 578 F. 2d, at 435 n. 3, citing *Phillips* v. *Evening Star Newspaper Co.,*

We granted certiorari, 439 U. S. 1066 (1979), and we now reverse. We hold that the District Court and the Court of Appeals were wrong in concluding that petitioner was a public figure within the meaning of this Court's defamation cases. Petitioner therefore was not required by the First Amendment to meet the "actual malice" standard of *New York* ✓ *Times Co.* v. *Sullivan, supra,* in order to recover from respondents.[3]

During 1957 and 1958, a special federal grand jury sitting in New York City conducted a major investigation into the activities of Soviet intelligence agents in the United States. As a result of this investigation, petitioner's aunt and uncle, Myra and Jack Soble, were arrested in January 1957 on charges of spying. The Sobles later pleaded guilty to espionage charges, and in the ensuing months, the grand jury's investigation focused on other participants in a suspected Soviet espionage ring, resulting in further arrests, convictions, and

Civ. No. 9999–75 (June 30, 1977). We assume that the Court of Appeals is as familiar as we are with the general principle that dispositive issues of statutory and local law are to be treated before reaching constitutional issues. *E. g., Dillard* v. *Virginia Industrial Comm'n,* 416 U. S. 783, 785 (1974); *Alma Motor Co.* v. *Timken-Detroit Axle Co.,* 329 U. S. 129, 136 (1946); *Siler* v. *Louisville & Nashville R. Co.,* 213 U. S. 175, 193 (1909). We interpret the footnote to the Court of Appeals' opinion in this case, where jurisdiction is based upon diversity of citizenship, to indicate its view that *Phillips* represents a more accurate expression of District of Columbia law than the dicta from *Hatter* and that, therefore, the appeal could not be decided without reaching the constitutional question. See *Commissioner* v. *Estate of Bosch,* 387 U. S. 456, 465 (1967); *King* v. *Order of Travelers,* 333 U. S. 153, 162 (1948); *West* v. *American Tel. & Tel. Co.,* 311 U. S. 223, 236–237 (1940); *Washington Times Co.* v. *Bonner,* 66 App. D. C. 280, 86 F. 2d 836 (1936); *Johnson* v. *Johnson Pub. Co.,* 271 A. 2d 696 (D. C. App. 1970); *Chaloner* v. *Washington Post Co.,* 36 App. D. C. 231 (1911).

[3] Petitioner also challenges the propriety of summary judgment on the issue of "actual malice." Brief for Petitioner 21–31. In view of our disposition of the public-figure issue, we need not and do not reach this question. See generally *Hutchinson* v. *Proxmire, ante,* at 120 n. 9.

guilty pleas. On the same day the Sobles were arrested, petitioner was interviewed by agents of the Federal Bureau of Investigation at his home in the District of Columbia.[4] Petitioner was interviewed several more times during the following months in both Washington and in New York City and traveled to New York on various occasions pursuant to grand jury subpoenas.

On July 1, 1958, however, petitioner failed to respond to a grand jury subpoena directing him to appear on that date. Petitioner previously had attempted to persuade law enforcement authorities not to require him to travel to New York for interrogation because of his state of mental depression. App. 91 (affidavit of petitioner, June 15, 1976).[5] On July 14, a Federal District Judge issued an order to show cause why petitioner should not be held in criminal contempt of court. These events immediately attracted the interest of the news media, and on July 15 and 16, at least seven news stories focusing on petitioner's failure to respond to the grand jury subpoena appeared in New York and Washington newspapers.

Petitioner appeared in court on the return date of the show-cause order and offered to testify before the grand jury, but

---

[4] "Wolston was born in Russia in 1918. He subsequently lived in Lithuania, Germany, France, and England before coming to the United States in 1939. The army drafted him in 1942, and during his tour of duty he became a naturalized citizen; he was trained as an interpreter and served primarily in Alaska. After receiving an honorable discharge in 1946 he worked as an interpreter for the United States Military Government and the State Department in Allied-occupied Berlin. He returned to the United States in 1951 and worked as a clerk until 1953, when he enrolled in an undergraduate program at New York University. In 1955 he and his wife moved to Washington, D. C., where he worked several months for the Army Map Service and then as a free-lance translator until January 1957. Deposition of Ilya Wolston at 5–42." 429 F. Supp., at 169 n. 1.

[5] Since this case was decided on respondents' motion for summary judgment, we must construe the record most favorably to petitioner. *E. g., Bishop* v. *Wood,* 426 U. S. 341, 347 n. 11 (1976); *United States* v. *Diebold, Inc.,* 369 U. S. 654, 655 (1962).

the offer was refused. A hearing then commenced on the contempt charges. Petitioner's wife, who then was pregnant, was called to testify as to petitioner's mental condition at the time of the return date of the subpoena, but after she became hysterical on the witness stand, petitioner agreed to plead guilty to the contempt charge. See App. 92 (affidavit of petitioner, June 15, 1976). He received a 1-year suspended sentence and was placed on probation for three years, conditioned on his cooperation with the grand jury in any further inquiries regarding Soviet espionage. *Ibid.* Newspapers also reported the details of the contempt proceedings and petitioner's guilty plea and sentencing. In all, during the 6-week period between petitioner's failure to appear before the grand jury and his sentencing, 15 stories in newspapers in Washington and New York mentioned or discussed these events. This flurry of publicity subsided following petitioner's sentencing, however, and, thereafter, he succeeded for the most part in returning to the private life he had led prior to issuance of the grand jury subpoena. 429 F. Supp., at 174.[6] At no time was petitioner indicted for espionage.

In *New York Times Co.* v. *Sullivan,* 376 U. S., at 279–280, the Court held that the First and Fourteenth Amendments prohibit a public official from recovering damages for a defamatory falsehood relating to his official conduct absent proof that the statement was made with "actual malice," as that term is defined in that opinion. See also *St. Amant* v. *Thompson,* 390 U. S. 727, 731 (1968). Three years later, the Court

---

[6] A short time after these events, petitioner was mentioned in two publications. In the book My Ten Years as a Counterspy, written by Boris Morros and published in 1959, Morros, a former confederate of Jack Soble who later became a double agent, states that Soble identified petitioner as a Soviet agent. App. 30–34. And in 1960, a report prepared by the Federal Bureau of Investigation, entitled Exposé of Soviet Espionage May 1960, listed petitioner's name among people "the FBI investigation resulted in identifying as Soviet intelligence agents." S. Doc. No. 114, 86th Cong., 2d Sess., 24, 26–27 (1960).

extended the *New York Times* standard to "public figures." *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 162 (1967) (Warren, C. J., concurring in result). But in *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 344–347 (1974), we declined to expand the protection afforded by that standard to defamation actions brought by private individuals. We explained in *Gertz* that the rationale for extending the *New York Times* rule to public figures was twofold. First, we recognized that public figures are less vulnerable to injury from defamatory statements because of their ability to resort to effective "self-help." They usually enjoy significantly greater access than private individuals to channels of effective communication, which enable them through discussion to counter criticism and expose the falsehood and fallacies of defamatory statements. 418 U. S., at 344; see *Curtis Publishing Co.* v. *Butts,* 388 U. S., at 155 (plurality opinion); *id.,* at 164 (Warren, C. J., concurring in result). Second, and more importantly, was a normative consideration that public figures are less deserving of protection than private persons because public figures, like public officials, have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." 418 U. S., at 345; see *Curtis Publishing Co.* v. *Butts, supra,* at 164 (Warren, C. J., concurring in result). We identified two ways in which a person may become a public figure for purposes of the First Amendment:

> "For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." 418 U. S., at 345.

See *id.,* at 351; *Time, Inc.* v. *Firestone,* 424 U. S. 448, 453 (1976).

Neither respondents nor the lower courts relied on any claim that petitioner occupied a position of such "persuasive power and influence" that he could be deemed one of that small group of individuals who are public figures for all purposes. Petitioner led a thoroughly private existence prior to the grand jury inquiry and returned to a position of relative obscurity after his sentencing. He achieved no general fame or notoriety and assumed no role of special prominence in the affairs of society as a result of his contempt citation or because of his involvement in the investigation of Soviet espionage in 1958. See *Time, Inc.* v. *Firestone, supra,* at 453; *Gertz* v. *Robert Welch, Inc., supra,* at 352.

Instead, respondents argue, and the lower courts held, that petitioner falls within the second category of public figures— those who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved"—and that, therefore, petitioner is a public figure for the limited purpose of comment on his connection with, or involvement in, Soviet espionage in the 1940's and 1950's. 188 U. S. App. D. C., at 189, 578 F. 2d, at 431; 429 F. Supp., at 174–178. Both lower courts found petitioner's failure to appear before the grand jury and citation for contempt determinative of the public-figure issue. The District Court concluded that by failing to appear before the grand jury and subjecting himself to a citation for contempt, petitioner "became involved in a controversy of a decidedly public nature in a way that invited attention and comment, and thereby created in the public an interest in knowing about his connection with espionage . . . ." *Id.,* at 177 n. 33. Similarly, the Court of Appeals stated that by refusing to comply with the subpoena, petitioner "stepped center front into the spotlight focused on the investigation of Soviet espionage. In short, by his voluntary action he invited attention and comment in connection with the public questions involved in the investigation of espionage." 188 U. S. App. D. C., at 189, 578 F. 2d, at 431.

We do not agree with respondents and the lower courts that petitioner can be classed as such a limited-purpose public figure.[7] First, the undisputed facts do not justify the conclusion of the District Court and Court of Appeals that petitioner "voluntarily thrust" or "injected" himself into the forefront of the public controversy surrounding the investigation of Soviet espionage in the United States.[8] See *Time, Inc.* v. *Firestone, supra,* at 453–454; *Gertz* v. *Robert Welch, Inc., supra,* at 352; *Curtis Publishing Co.* v. *Butts, supra,* at 155 (plurality opinion). It would be more accurate to say that petitioner was dragged unwillingly into the controversy. The Government pursued him in its investigation. Petitioner did fail to respond to a grand jury subpoena, and this failure, as well as his subsequent citation for contempt, did attract

---

[7] Both lower courts found that petitioner became a public figure at the time of his contempt citation in 1958. See 188 U. S. App. D. C., at 189, 578 F. 2d, at 431; 429 F. Supp., at 176–177. Petitioner argued below that even if he was once a public figure, the passage of time has restored him to the status of a private figure for purposes of the First Amendment. Both the District Court and the Court of Appeals rejected this argument. 188 U. S. App. D. C., at 189, 578 F. 2d, at 431; 429 F. Supp., at 178. And petitioner has abandoned the argument in this Court. Reply Brief for Petitioner 5–6, n. 8; Tr. of Oral Arg. 10. Because petitioner does not press the issue in this Court and because we conclude that petitioner was not a public figure in 1958, we need not and do not decide whether or when an individual who was once a public figure may lose that status by the passage of time.

[8] It is difficult to determine with precision the "public controversy" into which petitioner is alleged to have thrust himself. Certainly, there was no public controversy or debate in 1958 about the desirability of permitting Soviet espionage in the United States; all responsible United States citizens understandably were and are opposed to it. Respondents urge, and the Court of Appeals apparently agreed, that the public controversy involved the propriety of the actions of law enforcement officials in investigating and prosecuting suspected Soviet agents. 188 U. S. App. D. C., at 189, 578 F. 2d, at 431; Brief for Respondents 26–27; Tr. of Oral Arg. 27–29. We may accept, *arguendo,* respondents' characterization of the "public controversy" involved in this case, for it is clear that petitioner fails to meet the other criteria established in *Gertz* for public-figure status.

media attention. But the mere fact that petitioner voluntarily chose not to appear before the grand jury, knowing that his action might be attended by publicity, is not decisive on the question of public-figure status. In *Gertz,* we held that an attorney was not a public figure even though he voluntarily associated himself with a case that was certain to receive extensive media exposure. 418 U. S., at 352. We emphasized that a court must focus on the "nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Ibid.* In *Gertz,* the attorney took no part in the criminal prosecution, never discussed the litigation with the press, and limited his participation in the civil litigation solely to his representation of a private client. *Ibid.* Similarly, petitioner never discussed this matter with the press and limited his involvement to that necessary to defend himself against the contempt charge. It is clear that petitioner played only a minor role in whatever public controversy there may have been concerning the investigation of Soviet espionage. We decline to hold that his mere citation for contempt rendered him a public figure for purposes of comment on the investigation of Soviet espionage.

Petitioner's failure to appear before the grand jury and citation for contempt no doubt were "newsworthy," but the simple fact that these events attracted media attention also is not conclusive of the public-figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. To accept such reasoning would in effect re-establish the doctrine advanced by the plurality opinion in *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 44 (1971), which concluded that the *New York Times* standard should extend to defamatory falsehoods relating to private persons if the statements involved matters of public or general concern. We repudiated this proposition in *Gertz* and in *Firestone,* however, and we reject it again today. A libel defendant must show more than mere newsworthiness to

justify application of the demanding burden of *New York Times*. See *Time, Inc.* v. *Firestone*, 424 U. S., at 454.

Nor do we think that petitioner engaged the attention of the public in an attempt to influence the resolution of the issues involved. Petitioner assumed no "special prominence in the resolution of public questions." See *Gertz* v. *Robert Welch, Inc.*, 418 U. S., at 351. His failure to respond to the grand jury's subpoena was in no way calculated to draw attention to himself in order to invite public comment or influence the public with respect to any issue. He did not in any way seek to arouse public sentiment in his favor and against the investigation. Thus, this is not a case where a defendant invites a citation for contempt in order to use the contempt citation as a fulcrum to create public discussion about the methods being used in connection with an investigation or prosecution. To the contrary, petitioner's failure to appear before the grand jury appears simply to have been the result of his poor health. 429 F. Supp., at 177 n. 33; App. 91–92 (affidavit of petitioner, June 15, 1976). He then promptly communicated his desire to testify and, when the offer was rejected, passively accepted his punishment. There is no evidence that petitioner's failure to appear was intended to have, or did in fact have, any effect on any issue of public concern. In short, we find no basis whatsoever for concluding that petitioner relinquished, to any degree, his interest in the protection of his own name.

This reasoning leads us to reject the further contention of respondents that any person who engages in criminal conduct automatically becomes a public figure for purposes of comment on a limited range of issues relating to his conviction. Brief for Respondents 24; Tr. of Oral Arg. 15, 17. We declined to accept a similar argument in *Time, Inc.* v. *Firestone, supra,* at 457, where we said:.

> "[W]hile participants in some litigation may be legitimate 'public figures,' either generally or for the limited

purpose of that litigation, the majority will more likely resemble respondent, drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or by others. There appears little reason why these individuals should substantially forfeit that degree of protection which the law of defamation would otherwise afford them simply by virtue of their being drawn into a courtroom. The public interest in accurate reports of judicial proceedings is substantially protected by *Cox Broadcasting Co.* [v. *Cohn,* 420 U. S. 469 (1975)]. As to inaccurate and defamatory reports of facts, matters deserving no First Amendment protection . . . , we think *Gertz* provides an adequate safeguard for the constitutionally protected interests of the press and affords it a tolerable margin for error by requiring some type of fault."

We think that these observations remain sound, and that they control the disposition of this case. To hold otherwise would create an "open season" for all who sought to defame persons convicted of a crime.

Accordingly, the judgment of the Court of Appeals is

*Reversed.*

Mr. Justice Blackmun, with whom Mr. Justice Marshall joins, concurring in the result.

I agree that petitioner is not a "public figure" for purposes of this case. The Court reaches this conclusion by reasoning that a prospective public figure must enter a controversy "in an attempt to influence the resolution of the issues involved," *ante,* at 168, and that petitioner failed to act in that manner purposefully here. The Court seems to hold, in other words, that a person becomes a limited-issue public figure only if he literally or figuratively "mounts a rostrum" to advocate a particular view.

I see no need to adopt so restrictive a definition of "public figure" on the facts before us. Assuming, *arguendo*, that petitioner gained public-figure status when he became involved in the espionage controversy in 1958, he clearly had lost that distinction by the time respondents published KGB in 1974. Because I believe that the lapse of the intervening 16 years renders consideration of this petitioner's original public-figure status unnecessary, I concur only in the result.*

In *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974), this Court held that a person may become a public figure for a limited range of issues if he "voluntarily injects himself or is drawn into a particular public controversy." *Id.*, at 351. Such a person, the Court reasoned, resembles a public official in that he typically enjoys "significantly greater access to the channels of effective communication" and knowingly "runs the risk of closer public scrutiny" than would have been true had he remained in private life. *Id.*, at 344. The passage of time, I believe, often will be relevant in deciding whether a person possesses these two public-figure characteristics. First, a lapse of years between a controversial event and a libelous utterance may diminish the defamed party's access to the means of counterargument. At the height of the publicity

---

*The Court notes, *ante,* at 166 n. 7, that petitioner at oral argument here disclaimed the contention that the passage of time had restored him to private status, electing to place all his eggs in the more expansive basket that forms the framework of the Court's opinion. Petitioner proffered this contention in both the District Court and the Court of Appeals, however, and both courts expressly considered it. 429 F. Supp. 167, 178 (1977); 188 U. S. App. D. C. 185, 189, 578 F. 2d 427, 431 (1978). Under these circumstances, petitioner's tactical decision does not foreclose the "passage of time" rationale as a *ratio decidendi.* Indeed, petitioner makes the related argument that, if he should be deemed a public figure, the passage of time would be relevant in determining whether respondents' failure to investigate amounted in this case to "actual malice." Reply Brief for Petitioner 5–6, n. 8; Tr. of Oral Arg. 10–12.

surrounding the espionage controversy here, petitioner may well have had sufficient access to the media effectively to rebut a charge that he was a Soviet spy. It would strain credulity to suggest that petitioner could have commanded such media interest when respondents published their book in 1974. Second, the passage of time may diminish the "risk of public scrutiny" that a putative public figure may fairly be said to have assumed. In ignoring the grand jury subpoena in 1958, petitioner may have anticipated that his conduct would invite critical commentary from the press. Following the contempt citation, however, petitioner "succeeded for the most part in returning to . . . private life." *Ante,* at 163. Any inference that petitioner "assumed the risk" of public scrutiny in 1958 assuredly is negated by his conscious efforts to regain anonymity during the succeeding 16 years.

This analysis implies, of course, that one may be a public figure for purposes of contemporaneous reporting of a controversial event, yet not be a public figure for purposes of historical commentary on the same occurrence. Historians, consequently, may well run a greater risk of liability for defamation. Yet this result, in my view, does no violence to First Amendment values. While historical analysis is no less vital to the marketplace of ideas than reporting current events, historians work under different conditions than do their media counterparts. A reporter trying to meet a deadline may find it totally impossible to check thoroughly the accuracy of his sources. A historian writing *sub specie aeternitatis* has both the time for reflection and the opportunity to investigate the veracity of the pronouncements he makes.

For these reasons, I conclude that the lapse of 16 years between petitioner's participation in the espionage controversy and respondents' defamatory reference to it was sufficient to erase whatever public-figure attributes petitioner once may have possessed. Because petitioner clearly was a private

individual in 1974, I see no need to decide the more difficult question whether he was a public figure in 1958.

MR. JUSTICE BRENNAN, dissenting.

I dissent. I agree with the holding of the District Court, 429 F. Supp. 167, 176 (1977), affirmed by the Court of Appeals, 188 U. S. App. D. C. 185, 189, 578 F. 2d 427, 431 (1978), that petitioner qualified "as a public figure for the limited purpose of comment on his connection with, or involvement in, espionage in the 1940's and '50's." I further agree with the holding of the District Court, 429 F. Supp., at 178, affirmed by the Court of Appeals, 188 U. S. App. D. C., at 189, 578 F. 2d, at 431, that petitioner also qualified as a public figure in 1974. That conclusion follows, in my view, for the reasons stated by the Court of Appeals, *ibid.*, 578 F. 2d, at 431: "The issue of Soviet espionage in 1958 and of Wolston's involvement in that operation continues to be a legitimate topic of debate today, for that matter concerns the security of the United States. The mere lapse of time is not decisive."

I disagree, however, with the holding of the District Court, affirmed by the Court of Appeals, that respondent Barron was entitled to summary judgment. In my view the evidence raised a genuine issue of fact respecting the existence of actual malice on his part. I would therefore reverse the judgment of the Court of Appeals and remand to the District Court for trial of that issue.