**Morarji DESAI, Plaintiff,**

v.

**Seymour M. HERSH, Defendant.**

No. 83 C 4232.

United States District Court,
N.D. Illinois, E.D.

July 5, 1989.

Nunc Pro Tunc May 30, 1989.

Supplemental Opinion July 14, 1989.

---

Tyrone C. Fahner, Daniel M. Harris, Mayer, Brown & Platt, U.S. Atty., Thomas P. Walsh, Asst. U.S. Atty., Robert Orman, Law Offices, Robert Orman, Cyriac D. Kappil, George M. Burditt, Malcolm A. Chandler, Robert G. Epsteen, Burditt Bowles & Radzius, Chicago, Ill., for plaintiff.

Donald G. Peterson, Schaffenegger, Watson & Peterson, Chicago, Ill., for Kroch's & Brentano's, Inc.

Michael Coffield, David L. Carden, Lee Ann Russo, Michael T. Trucco, Coffield, Ungarett, Harris & Slavin, Chicago, Ill., for defendant.

Bernard J. Nussbaum, Harold C. Hirshman, Sonnenschein, Carlin et al., Chicago, Ill., for Seymour Hersh.

## AMENDED ORDER

NORGLE, District Judge.

Before the court is defendant's motion to dismiss Counts II, III and IV of plaintiff's four-count amended complaint, which seeks in the aggregate $185 Million in damages, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the motion is granted in part and the remainder treated as a motion for summary judgment, with further briefing allowed.

## FACTS

Plaintiff, Morarji Desai, is a citizen of India. In his own words, he has served India as a "judge, state official, member of Parliament, cabinet member, finance minister, deputy prime minister, and prime minister. Under Mahatma Ghandi, plaintiff was a leader in the passive resistance movement against British rule in India." Amended Complaint ¶ 2. In sum, plaintiff is a well-known political activist and public servant in India and, to a lesser extent, in the world at large.

Defendant, Seymour M. Hersh, is the author of *The Price of Power: Kissinger in the Nixon White House* (the "Book"). Initially, plaintiff also sued the publisher, Simon & Schuser, Inc., a corporate affiliate of the publisher, Summit Books, and a corporate officer, James Silberman. However, during the pendency of this motion, plaintiff voluntarily dismissed these parties, with prejudice, leaving Hersh as the sole remaining defendant. The Book concerns the foreign policy of the United States during the first term of the administration of President Richard M. Nixon, and, as indicated by its title, places a special emphasis on the actions of Secretary of State and National Security Advisor Henry Kissinger.

This action focuses on certain portions of the Book which, in the course of examining the conduct of the United States Central Intelligence Agency ("CIA") and its role in the formulation of U.S. foreign policy, state that the plaintiff, while an official in the government of India, sold Indian state secrets to the CIA. In the Book, it is also stated that plaintiff was fired from the post of deputy prime minister by Indira Ghandi in 1969.

Plaintiff's amended complaint alleges that these statements concerning the plaintiff are false and defamatory in that they either falsely impute to the plaintiff the commission of a crime under Indian law or falsely impute to the plaintiff an inability to perform or want of integrity in the discharge of the duties of his office. Plaintiff also alleges that defendant caused or permitted the Book to be published in India. Count I seeks recovery for intentional or reckless defamation of the plaintiff, under American law. Count II seeks recovery for negligent defamation, also under American law. Counts III and IV seek recovery for negligent defamation and defamation, respectively, based upon Indian law, for only those damages incurred in India. Memorandum In Support Of Amended Complaint ("Memo") at 2.

Defendant seeks dismissal of Count II on the grounds that, under American law, an action by a public figure for negligent defamation is constitutionally impermissible. Defendant moves to dismiss Counts III and IV on the grounds that the first amendment precludes application of Indian defamation law; that, even if the court were permitted to employ Indian defamation law, applicable choice of law rules require the court to utilize American defamation law; and that the "single publication rule" precludes application of the substantive law of two jurisdictions in a single civil action.

## DISCUSSION

On a motion to dismiss, the allegations of the complaint, as well as the reasonable inferences to be drawn from them, are taken as true. *Doe v. St. Joseph's Hosp.,* 788 F.2d 411 (7th Cir.1986). The plaintiff need not set out in detail the facts upon which a claim is based, but must allege sufficient facts to outline the cause of action. *Id.* The complaint must state either direct or inferential allegations concerning all of the material elements necessary for recovery under the relevant legal theory. *Mescall v. Burrus,* 603 F.2d 1266 (7th Cir. 1979). The court is not required to accept legal conclusions either alleged or inferred from pleaded facts. *Carl Sandburg Village Condominium Ass'ns No. 1 v. First Condominium Development Co.,* 758 F.2d 203, 207 (7th Cir.1985). Dismissal under Rule 12(b)(6) is improper unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Papapetropoulous v. Milwaukee Transport Services,* 795 F.2d 591, 594 (7th Cir.1986).

## COUNT II

The court will first address Count II, which seeks to recover for negligent defamation under the law of whatever state applicable choice of law rules would require the court to employ. The essential elements of a libel action have, over time and numerous Supreme Court decisions, come to be dominated by first amendment considerations. "When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much

higher barrier before recovering damages from a media defendant than is raised by the common law." *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986).

Under *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny, a public figure will be successful in prosecuting a defamation action only where, in addition to proving that the statement was untrue, defamatory and concerning the plaintiff, he provides convincingly clear proof that the defamatory falsehood was "made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 725–26; *see Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162–65, 87 S.Ct. 1975, 1995–97, 18 L.Ed.2d 1094 (1967) (applying "actual malice" standard to public figures); *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 880, 99 L.Ed.2d 41 (1988).

Even a private figure plaintiff, where a matter of public concern is involved, must bear the burden of proving some fault on the part of the media defendant, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 325, 94 S.Ct. 2997, 3000, 41 L.Ed.2d 789 (1974), and the falsity of the statement in question, *Hepps*, 106 S.Ct. at 1563. Moreover, a private figure plaintiff must also prove "actual malice" if he seeks presumed or punitive damages. *Gertz*, 418 U.S. at 348–50, 94 S.Ct. at 3011–12. Only where the speech is exclusively of private concern and the plaintiff a private figure is the Constitution largely silent. *See, e.g., Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (focusing on public concern nature of speech, rather than media status of defendant).

In explaining the necessity of first amendment protections, the Supreme Court emphasized that "the maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the republic, is a fundamental principle of our constitutional system." *New York Times*, 376 U.S. at 269, 84 S.Ct. at 720, *quoting Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). Thus, whatever state common law may previously have required, the U.S. Supreme Court has concluded that the first amendment dictates the minimum contours of libel law.

█ Plaintiff is a public figure. Deposition of Morarji Desai taken May 22, 1984 at 81–94; *see also Prager v. ABC, Inc.*, 569 F.Supp. 1229, 1232 (D.N.J.1983) (trial court determines status of defamation plaintiff). Though plaintiff has stipulated to this status, a brief discussion on this point will aid in the inquiry of first amendment applicability with respect to Counts III and IV. As a revolutionary and political official of the world's second most populous country, Desai has held himself out, and is known, to a varying extent throughout the world. *See, e.g., Sharon v. Time, Inc.*, 599 F.Supp. 538, 563 (S.D.N.Y.1984) (former Israeli defense minister is public figure). Even if plaintiff may not be characterized as a public figure for all purposes, his actions have made him a public figure in the United States, at least for the limited purpose of commenting upon his relationships with the United States government and its officials while he was a public official of India. As such, plaintiff has the access to media channels which the Supreme Court found, in part, justified the "actual malice" standard. *Gertz*, 418 U.S. at 344, 94 S.Ct. at 3009. The mere passage of time since he has left his country's service does not change his status as a public figure. Plaintiff's own assertions of continued prominence preclude determining that he made "conscious efforts to regain anonymity." *Wolston v. Readers Digest Ass'n, Inc.*, 443 U.S. 157, 172, 99 S.Ct. 2701, 2709–2710, 61 L.Ed.2d 450 (1979) (Blackmun, J., concurring).

█ While the status of the plaintiff is the primary determinant of the applicability of the "actual malice" standard, the Supreme Court has dealt with consideration of the public concern nature of the

speech, as is witnessed by the quote from *Hepps* and as will be discussed below. In any event, absent invasions of privacy, speech about a public figure is generally a matter of public concern. Here, the conduct of the foreign policy of the United States during the administration of President Richard M. Nixon is unquestionably a matter of public concern.

■ Having concluded that plaintiff is a public figure and that the Book is about a matter of public concern, the court need not decide which state law applies to Count II in order to determine whether the plaintiff has pleaded a cause of action. Whatever state's law might be applicable is subject to the strictures of the first amendment, which prohibits a public figure from recovering in a defamation action involving a matter of public concern upon a showing of mere negligence.

■ There is no support for plaintiff's contention that, despite his status as a public figure, the "actual malice" standard does not apply because the Book is not "hot news". In *Wolston* the "actual malice" standard was inapplicable because the plaintiff was not a "public figure." 443 U.S. at 169, 99 S.Ct. at 2708. The distinction between "hot news" and historical commentary may be relevant to the applicability of the "actual malice" standard, but not in the manner plaintiff implies. Rather, the passage of time which results in a matter changing from "hot news" to historical commentary may also result in the potential defamation plaintiff losing his "public figure" status. The other cases cited by plaintiff are also inapposite in that the courts clearly applied the "actual malice" standard. *See Hunt v. Liberty Lobby,* 720 F.2d 631, 642–48 (11th Cir.1983); *Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 537–540 (7th Cir.1982). Therefore, Count II, which seeks recovery based upon negligence, is dismissed with prejudice.

## Counts III and IV

Defendant next asserts that it would be constitutionally impermissible for the court to apply Indian defamation law in Counts III and IV of this action. Specifically, defendant contends that, as plaintiff is a public figure and as Indian defamation law does not require a public figure to prove "actual malice," to apply Indian defamation law would be contrary to the first amendment.

The only authority submitted by the plaintiff, pursuant to Fed.R.Civ.P. 44.1, from which to discern Indian defamation law is a single treatise excerpt and a single judicial decision. Nevertheless, based on this authority, plaintiff and defendant agree that under Indian defamation law, which has its roots in English law, a claim arises upon proof of a defamatory statement or representation concerning the plaintiff and publication of the defamatory statement by the defendant. There is no requirement under Indian defamation law that the plaintiff prove the falsity of the defamatory statement, any particular state of mind or fault on behalf of the defendant, or damage to the plaintiff's reputation. Apparently, these are all presumed. Of the defenses available under Indian law only "justification", which is equivalent to truth, appears applicable to defendant. Statements of opinion are not protected. Additionally, to prevent a tortfeasor from profiting from his wrong, Indian defamation law allows for punitive damages where defendant's conduct is designed to make a profit which exceeds the damages to the plaintiff. Memo, Appendix.

The court need not inquire further to identify the precise elements and current state of Indian defamation law. Indian defamation law clearly lacks the crucial first amendment protections which have been superimposed upon American common law defamation. Plaintiff acknowledges this, but nevertheless concludes that for the court to apply Indian defamation law in this action would not be contrary to the first amendment. Plaintiff asserts that the defendant is not entitled to the protections of the first amendment when they publish for profit in India a book that defames an Indian citizen. In plaintiff's view, because the first amendment is designed to protect the free flow of information to the American people, first amendment interests are

not implicated by defendant's publication of allegedly defamatory statements in India unrelated to the free flow of information to the American people.

Application of the law of a foreign nation in United States courts in other contexts is not novel. Yet, in those situations first amendment considerations are absent. While "it is well settled that the Constitution restrains not only the power of the federal government to act in this country but in many respects also its power to affect American citizens in foreign countries," the applicability of first amendment protections to extraterritorial activities is uncertain. *See Laker Airways, Ltd. v. Pan American World Airways, Inc.*, 604 F.Supp. 280, 287 (D.D.C.1984), *citing Haig v. Agee*, 453 U.S. 280, 308, 101 S.Ct. 2766, 2782, 69 L.Ed.2d 640 (1981). The only reported decision which provides guidance is *DeRoburt v. Gannett Company, Inc.*, 83 F.R.D. 574 (D.Hawaii 1979). Other reported cases in which United States courts have applied foreign defamation law predate *New York Times. See, e.g. Philp v. Macri*, 261 F.2d 945 (9th Cir.1958); *Hartmann v. Time, Inc.*, 166 F.2d 127 (3d Cir.1948); *Bakhshandeh v. American Cyanamid Co.*, 211 F.Supp. 803 (S.D.N.Y.1962); *Andretto Bank A.G. v. Goodbody & Co.*, 10 A.D.2d 696, 197 N.Y.S.2d 793 (1960); *Gallegos v. Union Tribune Publishing Co.*, 195 Cal. App.2d 791, 16 Cal.Rptr. 185 (1961). Decisions involving choice of law and the existence of jurisdiction in defamation cases where the alternatives are states of the union provide little help, since, whichever alternative is chosen, the first amendment applies.

*DeRoburt* may provide some guidance. There the president of Nauru brought, in a Federal District Court, an action for defamation against an American newspaper publisher, certain counts of which sought recovery under the laws of Nauru. The defamation law of Nauru, like Indian defamation law, is derived from English common law. In ruling on the defendants' motion to dismiss the Nauru law counts, the court conducted a choice of law analysis, considering first amendment interests to be one of the relevant policies of the forum and, as such, one of the factors pertinent to the choice of law decision. The court noted that the importance of the policy that critics of public officials and public figures receive the protection afforded by the first amendment "cannot be overstated". 83 F.R.D. at 579. Although finding that Nauru libel law lacked protections analogous to those imposed by the first amendment, the court concluded that "except for this dissimilarity, however, the policies underlying defamation law in ... [the United States] ..., do not, at this time, appear to conflict." 83 F.R.D. at 580. Thus, the court held that the application of the libel laws of Nauru modified by the imposition of first amendment safeguards announced in *New York Times* "would provide a satisfactory accommodation of the relevant policies of this forum". *Id.* However, given the extensive modifications resulting from the imposition of first amendment safeguards, under *DeRoburt*, the (first amendment) exceptions swallow up the (foreign law) rule and the functional equivalent of American defamation law is applied.

Plaintiff asserts that *DeRoburt* is distinguishable in that the *DeRoburt* court's decision was based upon the defendant's "justifiable expectation" that the "actual malice" standard was applicable. As only a few isolated copies of the allegedly defamatory article entered Nauru, plaintiff concludes that the defendant in *DeRoburt*, unlike the defendant here, was not "exploiting" the Nauru market and thus could justifiably expect first amendment protections. The *DeRoburt* court did examine other relevant considerations, including the "justified expectations of the parties." However, plaintiff fails to state that in the course of examining these factors, the court indicated that first amendment considerations were overriding. Specifically, the *DeRoburt* court stated that "the public policy of the United States requires the application of the first amendment to libel cases brought in the courts of this country ..." 83 F.R.D. at 580. As *DeRoburt* is not distinguishable, the question becomes whether its reasoning is persuasive.

In examining whether first amendment protections apply to defamation actions brought in United States courts against United States citizens as a result of extra-territorial publications, the court must consider whether the purpose of the first amendment will be fostered. This inquiry will be premised upon the applicability of the "actual malice" standard if publication had been solely domestic—the plaintiff is a public figure or official. There are two obvious extremes. The first, which defendant is advancing, is in effect the rule in *DeRoburt:* in United States courts, the first amendment applies to all extraterritorial publications by U.S. citizens and persons within the protections of the Constitution. The Supreme Court has recognized the conflict between the societal values of avoiding media self-censorship and compensating individuals for harm from defamatory falsehoods. *Gertz*, 418 U.S. at 341-42, 94 S.Ct. at 3007-08. On the other hand, in an extraterritorial context, due regard must be given to the foreign nations' interest in compensating its own citizens for harm to their reputation from defamatory falsehoods. The value placed on reputation may differ greatly from modern to traditional societies. Admittedly, this interest may be protected through the courts of the foreign nation. (Plaintiff has, in fact, filed suit in India.) Yet, the practicalities of obtaining recovery in one suit for defamation occurring both without and within the United States, as well as a more easily enforceable (and potentially larger) judgment, lead foreign plaintiffs to file suit in this country.

█ The court concludes that, for purposes of suits brought in United States courts, first amendment protections do not apply to all extraterritorial publications by persons under the protections of the Constitution. Had defendant written a book and published it solely in India concerning plaintiff's activities as a public official in the government of India, but minimally related to a matter of public concern in this country, the need for protection of first amendment interests would be greatly lessened, if not entirely absent. In such an instance, foreign law could be applied here without offending the Constitution. The *DeRoburt* rule would be over-inclusive, providing predictability at the expense of a competing interest without furthering first amendment interests. The first amendment shields the actions of speakers for the benefit of their audience. *See Krizek v. Board of Education*, 713 F.Supp. 1131, 1137 (citations omitted) (N.D.Ill.1989). To allow the protections of the first amendment to be invoked where the interests it seeks to promote are absent would be to transform the first amendment from a shield into a sword.

The court also rejects the other extreme: the total inapplicability of the fist amendment to extraterritorial publications. Extending first amendment protections to extraterritorial re-publications of speech in certain instances may be necessary to insure the free flow of information to the American public. Plaintiff's reliance on *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), is misplaced. Plaintiff reasons that, like the Speech or Debate Clause, which shields a legislator's conduct in but not outside the walls of Congress, the first amendment protections apply to speech within the United States, but not without. That the purpose of the Speech or Debate Clause is to protect the integrity of the legislative process, and that therefore protections of the Speech or Debate Clause do not extend beyond what is necessary to protect that integrity, is without quarrel. 443 U.S. at 126-27, 99 S.Ct. at 2683-84. Because the Speech or Debate Clause, unlike the first amendment, provides absolute immunity there is a greater necessity to limit its application. Yet, it cannot be said that no extraterritorial publication can promote the free flow of information to the American public. For instance, one could easily foresee limited extraterritorial publication of a copy of the Book by its being sent to, or brought into, a foreign country by an American diplomat, an American national studying abroad, or even an American doing a little reading on a vacation.

Moreover, so as not to chill speech inside the United States relating to matters of

public concern, it may be necessary that first amendment protections spill over to more extensive extraterritorial re-publications of that speech, given the ease and likelihood of extraterritorial re-publication. By its nature, foreign policy involves the relationships between various nations and their representatives. Thus by definition no writing or speech which attempted to undertake an in-depth examination of American foreign policy could avoid mentioning other nations or their representatives. Application of Indian defamation law or any other foreign defamation law at odds with the first amendment could have a tremendous chilling effect. Our world is shrinking every day as a result of improvements in mass communications and travel. Publications may be disseminated worldwide in a matter of hours, with or without the permission of author or publisher. Indeed, applying plaintiff's suggested rule could have catastrophic implications for the electronic media in this age of international broadcasting from the United States. The advent and international popularity of the satellite dish may result in expression originally intended for domestic or limited extraterritorial publication being published worldwide, or even extraterrestrially.

Effectively, under plaintiff's suggested rule of law, publishers would be required to conform to the most restrictive law of defamation, wherever in the world that may be. This would be especially true with regard to publications concerning American foreign affairs which cannot help but mention foreign officials or former foreign officials, such as the plaintiff. The only other solution the court can posit, "sanitizing" foreign editions, deserves mention but not support. Under this "solution," which obviously would apply only to written expression, entry of "unsanitized" domestic editions into a foreign country could not be prevented.

■ Having rejected the all-or-nothing approach to first amendment extraterritorial application, the court must arrive at a limiting principle. In selecting a rule, priority should be given to one which is predictable, providing guidance to speakers in order to minimize the chilling effect which would result from the threat of possible application of foreign defamation law. One potential approach would be case-by-case balancing of the interests promoted by applying foreign law against the "public concern value" or newsworthiness of the speech. Under this approach, the greater the "public concern value" of speech, the more it is deserving of first amendment protection. Where the "public concern value" of the speech is great, such as with speech concerning the activities of the United States Government, the first amendment interest in protecting domestic publication would be sufficient to justify spillover protection of extraterritorial publications so as to avoid chilling domestic publications. In those instances, the interest to be furthered by application of foreign law would be outweighed. For purposes of suit in a United States court, the first amendment would follow the speech through the international stream of commerce to protect extraterritorial re-publications.

Focusing on the "public concern value" of speech would be consistent with the recognition that the Constitution "contemplates a bias towards unfettered speech at the expense, perhaps, of compensation for harm to reputation, at least where a public figure and a topic of enormous public interest, going to the heart of political discourse, is concerned." *Buckley v. Littell*, 539 F.2d 882, 889 (2d Cir.1976); *see also Dun & Bradstreet*, 472 U.S. at 758–60, 105 S.Ct. at 2944–46 (and citations within). Whether speech is of public concern is determined by the content, form, and context of the statement. 472 U.S. at 761, 105 S.Ct. at 2946 *quoting Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983).

Application of this approach to the facts in the instant case and in *DeRoburt* appears promising. The very subject of the Book—the conduct of United States foreign policy by the President of the United States and his senior foreign policy advisor— presents a compelling illustration of great "public concern value." As the first amendment protects the American public's

need for "uninhibited, robust, and wide-open" debate necessary to insure the free flow of information to the American people about matters concerning the United States, the court can envision no expression more deserving of first amendment protections than the Book.

Contrast the subject of the allegedly defamatory article in *DeRoburt:* the president of Nauru's conduct in the internal affairs of Nauru and its relation with the Marshall Islands. At first glance, this is hardly a matter of great public concern in the U.S. and portends merit to the "public concern value" approach. However, it is difficult to predict the use to which information contained in speech may be put. Upon further review, what might appear to be purely a matter of the internal affairs of a foreign nation, may be newsworthy and of public concern in the United States. As an example, under the facts in *DeRoburt,* the internal affairs of Nauru might be a matter of public concern regarding a decision by the United States to grant foreign aid to Nauru. Indeed, alomost any account of the affairs of foreign countries can, through the use of a reason or imagination, touch upon the affairs of the United States.

Use of a "subject matter" test distinguishing between matters of public or general concern and matters of private concern was advanced by the plurality in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 43–49, 91 S.Ct. 1811, 1819–23, 29 L.Ed.2d 296 (1971), as an alternative to hinging the applicability of the *New York Times* standard on the public or private status of the plaintiff. Although the subject matter of the speech is often discussed in determining the applicability of the *New York Times* standard, this approach was subsequently rejected, in part because of the difficulty of forcing judges to decide on a case-by-case basis which speech concerned matters of public or general interest. *Gertz,* 418 U.S. at 346, 94 S.Ct. at 3010; *Time, Inc. v. Firestone,* 424 U.S. 448, 456, 96 S.Ct. 958, 966, 47 L.Ed.2d 154 (1976). The Court also feared balancing the respective interests in an *ad hoc* manner would lead to "unpredictable results and uncertain applications." *Gertz,* 418 U.S. at

343–44, 94 S.Ct. at 3009. The failure to provide a predictable rule would result in chilling speech. *Id.* Another concern raised in *Gertz,* the specter of a private plaintiff lacking the media access of a public official or figure, yet forced to satisfy the "actual malice" test, 418 U.S. at 346, 94 S.Ct. at 3010, would not arise here. The subject matter test focusing on "public concern value" would only be applied to determine extraterritorial application of the first amendment after it had been determined that plaintiff was a public official or figure and thus the "actual malice" standard applicable for domestic publication.

Nevertheless, balancing is imprecise. *See Sec. of Labor v. Lauritzen,* 835 F.2d 1529, 1539 (7th Cir.1987) (Easterbrook, J., concurring); *Gaines Pet Foods v. Martin Bros. Int'l,* 692 F.Supp. 912, 914–15 (N.D. Ill.1988). At least in the domestic context, a broad rule of general application concerning the "actual malice" standard is favored. The Supreme Court has determined that the public or private status of the plaintiff provides greater certainty for speakers in determining the applicability of the "actual malice" standard, while respecting competing state interests. Yet, with respect to lesser protections derived from the first amendment such as the plaintiff's burden to prove falsity, *Hepps,* 106 S.Ct. at 1563, and some level of fault, *Gertz,* 418 U.S. at 325, 94 S.Ct. at 3000, the public or private nature of the speech provides sufficient guidance. However, it is one thing to determine whether a matter is of public concern. It is another and more difficult inquiry to then "balance" the expression's public concern value against the competing American and foreign interest in protecting reputations. Limited predictability and, correlatively, limited guidance would be the result. In addition, the application of a tougher burden—"actual malice"—than those imposed under *Gertz* and *Hepps* via the "subject matter" test would be at stake.

Furthermore, ultimately this approach might be of limited value, because most speech about foreign public officials and figures would be about matters of public

concern here. As a result, there is a danger that this balancing test would, as applied, begin to resemble the choice of law analysis applied in *DeRoburt*, which, while in theory allowing the "choice" of applying foreign law, neutralizes the differences between the choices by requiring the imposition of the "actual malice" standard. Although, this does illustrate the one virtue of the rule in *DeRoburt:* predictability. Yet, if first amendment protections apply to defendant, it would serve no purpose to allow Counts III and IV to survive, as in *DeRoburt*, through application of Indian law as modified by the first amendment. The modifications of Indian law with respect to burdens and standards of proving falsity, fault and damages would be so extensive that to do so would effectively make the Indian law counts redundant with the surviving American law count. On the other hand, if the tendency to tip the scales in favor of the first amendment in every case could be avoided, the vice of *DeRoburt*'s conclusion that a choice of law analysis is appropriate, 83 F.R.D. at 576–81, would be revealed. A true choice of law analysis would provide little if any predictability. Where the applicability of a foreign defamation law—which places low hurdles before the plaintiff and heavy burdens on the defendant—is a possibility, a guide for speakers is a necessity.

Thus, a balancing test focusing on the "public concern value" of speech alone does not provide an acceptable basis for determining the applicability of the first amendment to extraterritorial publication of otherwise protected speech. However, the court concludes that whether the speech is of public concern is important. It serves as the threshold inquiry in determining whether first amendment protections apply extraterritorially. For the court concludes that only where speech published in a foreign country is about a matter of public concern in the United States can first amendment protections "spill over" our borders. However, not in every instance involving speech of a public concern should first amendment protection apply. Public concern is, therefore, a necessary,

but not a sufficient, condition of extraterritorial protection.

This brings the court to the other possible factor to consider in determing first amendment protections in an extraterritorial context: whether the defamation defendant intentionally re-published the otherwise protected speech in the foreign country. This is the very factor suggested by plaintiff in his attempt to distinguish *DeRoburt*. Where publication in the foreign country is intentional, and the foreign market exploited, it may be fair to say that the publisher has purposefully abandoned the protections of the first amendment. This would be especially so where publication in the foreign country is extensive. Extensive publication in the foreign country would be evidence that publication was intentional. Intent to exploit the foreign market is also demonstrated by extensive publication in the foreign market where the availability of the foreign market was a substantial factor in the decision to publish at all (e.g. where U.S. sales are minimal). Limited intentional publication in the foreign county by the author and domestic publisher, where U.S. sales are substantial, would present a more difficult problem. Certainly, sending one or two copies into a foreign country does not indicate an intent to purposefully abandon first amendment protections, though one or two copies may do almost as much damage to a plaintiff's reputation as would a thousand. Yet, drawing a line on a case-by-case basis between "limited" and "extensive" publication, unless an arbitrary number was selected, would create the very problems of predictability which should be avoided.

On the other hand, where publication in the foreign country was solely the result of the actions of third parties, there can be no claim that the defendant abandoned the protections of the first amendment. But what of the case where the author and domestic publisher contract with a third-party which makes distribution of copies to the foreign country a possibility, or even a certainty? There, one might argue, the certainty of foreign publication rises to the level that the actions of the author and domestic publisher are the equivalent of

their having published the book in the foreign country themselves.

The examples of limited intentional foreign publication and third-party foreign publication present difficult choices. Nevertheless, there are solutions. The court concludes that, as a general rule, whether the first amendment applies to extraterritorial publication where the speech is a matter of public concern depends upon whether the defendant intentionally published the speech in the foreign country in a manner sufficient to indicate abandonment of first amendment protection.

Where publication in a foreign country is the result of the actions of a third-party, even where it is done pursuant to a contract with the author and domestic publisher for foreign distribution, only the third-party actually introducing the publication into the foreign country will be deemed to have waived first amendment protection. This result is also consistent with the scope of the protections of the Speech or Debate Clause under which the legislator, who utters a defamatory statement in Congress, is not responsible for a third-party's re-publication of that statement outside of Congress. Similarly, where the author and domestic publisher are not one and the same and the author sells rights to speech to the domestic publisher, which also publishes the speech in a foreign country, the author has not intentionally abandoned first amendment protection. Agency principles are not applied. This rule accomodates competing interests. Domestic speech is not chilled. Speakers should be free to engage in domestic publication, within applicable constitutional and state law limits, without the inevitable chilling effect which would result from fear of sale of the speech to a third party who would, unbeknownst to the author and domestic publisher, introduce the speech into a foreign country. Avoiding this chilling effect justifies limiting potential liability under foreign defamation law to the actual person or entity responsible for foreign publication, even where foreign distribution was a certainty. The defamation plaintiff may still recover under foreign law in the foreign courts against the actual person or entity responsible for the foreign publication. Moreover, though a strict standard, even the "actual malice" standard does not preclude recovery.

Where a limited number of foreign publications is the direct result of the intentional conduct of the domestic publisher the domestic publisher has not abandoned first amendment protection. A contrary rule would increase predictability, but in many cases be inconsistent with the principle of intentional abandonment of first amendment protection. For example, a foreign national could order a single copy of a book from the American publisher for delivery in his homeland. The decision to mail a copy of the book to the requester would likely be routinely made by low level employees of the publisher who, even if they were cognizant of the potential ramifications of the foreign address, are not proper parties to exercise the waiver of first amendment rights on behalf of their employers. This rule eliminates the possibility that an American publisher could be "lured by mail-order" into intentionally doing an act which would amount to unconsciously abandoning first amendment protections. Again, recovery under foreign defamation law would still be possible in the courts of the foreign nation, assuming jurisdiction exists. Admittedly, this conclusion reduces predictability by requiring a case-by-case determination of what constitutes intentional foreign publication sufficient to amount to an abandonment of first amendment protection. However, even the private versus public or limited public figure distinction and "actual malice" test do not provide a bright line rule in all cases. *See Wolston, supra.*

In light of the foregoing, the court holds as follows: in instances where the plaintiff is a public official or figure and thus heightened first amendment protections, including the "actual malice" standard, apply to domestic publication, these same protections will apply to extraterritorial publication of the same speech where the speech is of a matter of public concern and the publisher has not intentionally and directly

published the speech in the foreign country in a manner consistent with the intention to abandon first amendment protections. This principle, being based on conduct within the control of the potential defamation defendant, minimizes any "chilling effect" resulting from the potential application of foreign defamation law. An author or publisher who does not directly publish in a foreign country can rely on the protections in *New York Times*.

■ As discussed above, plaintiff is a public figure and thus the "actual malice" standard applies to domestic publication of the Book. The Book is about a matter of public concern. Therefore, the first amendment applies to extraterritorial publication of the Book, provided its protections have not been abandoned by the defendant through their intentional direct publication of the Book in India. Having narrowed the issues, the court will treat this motion to dismiss as a motion for summary judgment. *See* Fed.R.Civ.P. 12(b). Plaintiff alleges in his Amended Complaint that defendant has published the Book in India. Simon & Schuster, Inc., the publisher of the Book, which has since been dismissed as a defendant in this action, previously submitted an affidavit representing that it did not sell or distribute the Book in India. Neither plaintiff nor defendant has submitted affidavits in this matter. The court will allow all parties to present any additional affidavits, documents and memoranda concerning the respective defendants intentional publication of the Book in India.

## CONCLUSION

Count II is dismissed with prejudice. The parties shall, by June 16, 1989, submit any additional affidavits, documents, or memoranda with respect to summary judgment on Counts III and IV.

IT IS SO ORDERED.

## SUPPLEMENTAL OPINION

The court has reviewed the parties' submissions in response to the May 30, 1989 order (the "Order"), which has been amended to reflect that Seymour Hersh is the sole remaining defendant. A copy of the Amended Order is attached hereto.

A few points of clarification are in order. As set forth in the Order, Indian defamation law is inapplicable and defendant is entitled to summary judgment in his favor on Counts III and IV, unless defendant has intentionally and directly published the Book in India in a manner consistent with the intention to abandon his first amendment protections. Publication in a manner consistent with the intent to abandon first amendment protections may occur where foreign publication is substantial in comparison to domestic publication. Order at 25.

Thus, plaintiff's Supplemental Memorandum which refers to "the issue of whether defendant Hersh (the author) was directly or *indirectly* involved in the publication of the Book *outside the United States* ..." Supplemental Memorandum Pursuant to Court Order of May 30, 1989 at 1 (emphasis added), misses the mark in two respects.

First, only intentional *direct* extraterritorial publication may suffice to abandon first amendment protections.

Second, plaintiff is wrong when he interprets the Order to support the proposition that defendant's direct publication of the Book anywhere outside of United States abandons his first amendment protections for purposes of this suit seeking to apply Indian law. This was clearly not the court's holding, which sought to limit the chilling effect which may result from the potential application of foreign defamation law in United States courts by hinging the application of foreign law on the intentional conduct of the potential defamation defendant. Thus, first amendment protections are only abandoned with respect to the law of the nation in which there is intentional and direct publication in a manner consistent with the intent to abandon those protections. If, for example, defendant had intentionally and directly published the Book in Mexico, in a manner consistent with his intention to abandon first amendment protections, those protections would be abandoned only with respect to a suit brought here under Mexican law. However, defen-

dant's first amendment protections would still apply to a suit seeking to apply Indian law, where defendant's publication of the Book in India was either unintentional, indirect or unsubstantial. Under this scenario, defendant would have intentionally abandoned his first amendment protections and subjected himself to Mexican law, but not the law of any nation into which the Book might somehow be introduced.

Plaintiff asserts that, as Simon & Schuster is no longer a defendant, its affidavit can no longer serve as the basis to convert defendant's motion to dismiss into a motion for summary judgment under Fed.R.Civ.P. 12(b). However, Judge Plunkett, to whom this case was originally assigned, in ruling on plaintiff's motion to strike affidavits, rather than striking the Simon & Schuster affidavit, strongly urged plaintiff to submit a counter-affidavit. Judge Plunkett's decision not to exclude the affidavit and to request a counter-affidavit effectively operated to convert the motion to dismiss into a motion for summary judgment five years ago. Simon & Schuster's dismissal does not "deconvert" it. Simon & Schuster's affidavit remains relevant even after its dismissal, as summary judgment may be granted based upon non-party affidavits. Simon & Schuster is the publisher of the Book. It may be *the only* publisher of the Book. Although this conclusion is called into question by Simon & Schuster's averment that it does not have the rights to sell or distribute the Book in India. Affidavit at ¶ 5. Thus, either some other entity has the Indian rights or no one does (Hersh retained them). If Simon & Schuster is the only publisher of the Book, its affidavit denying Indian publication certainly is evidence that Hersh, for whom it is publishing the Book, did not publish the Book in India. Furthermore, as Judge Plunkett noted, the issue of whether foreign defamation law is applicable "is probably a mixed question of fact and law." Transcript of Proceedings before Honorable Paul E. Plunkett, August 31, 1984 at 8. The court agrees and concludes that it may *sua sponte* order the submission of affidavits necessary to resolve a mixed question of fact and law.

Finally, as defendant notes, plaintiff bears the burden of proving such intentional direct publication. Placing this burden on plaintiff's shoulders is consistent with his general shouldering of the burdens of proof in a defamation case. *See Grzelak v. Calumet Publishing Company, Inc.*, 543 F.2d 579, 582 (7th Cir.1975) (plaintiff bears burden of proving "actual malice"); *Lal v. CBS, Inc.*, 726 F.2d 97, 100 (3rd Cir 1984) (plaintiff bears burden of proving abandonment of privilege). However, while plaintiff may have the burden of proof on the issue of defendant's abandonment of first amendment rights, the court will not create a presumption against abandonment. Defendant, as moving party, still must put forth a factual basis for the conclusion that no genuine issue exists on that matter. Here defendant may do so by averring that Simon & Schuster is the only publisher of the Book, in effect adopting Simon & Schuster's affidavit, or defendant may set forth the circumstances under which he published the Book, specifically denying his own intentional direct publication of the Book in India in a manner consistent with the intent to abandon his first amendment rights. If defendant can do either, then plaintiff, in order to survive this motion, must submit his own affidavits on this matter.

Plaintiff has requested an "additional 28 days in which to obtain factual evidence of defendant's publication of the Book ..." Yet, plaintiff has known for five years that publication of the Book in India would be an issue, has, according to defendant, completed his deposition of Hersh, and has so far failed to submit an affidavit. Defendant has 7 days from the date of this order in which to submit affidavits. If defendant does so, plaintiff has an additional 7 days in which to submit counter-affidavits.

IT IS SO ORDERED.