Jose A. **LÓPEZ**, Plaintiff,

v.

**UNIVISION COMMUNICATIONS INC.** and **Antonio Martinez,** Defendants.

No. 98 Civ. 2487(LAK).

United States District Court, S.D. New York.

April 30, 1999.

---

Richard A. Canton, New York City, for plaintiff.

David A. Schulz, Rogers & Wells, New York City, for defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This libel case arises out of a series of televised investigative reports. The television station and its reporter suggested that plaintiff, a member of the Colombian Senate who also is a physician practicing in the New York area, touts credentials which "are largely invented."[1] The claim, in essence, is that Dr. López's resume substantially exaggerates his credentials and experience. Plaintiff argues that de-

fendants "have manipulated the facts of [plaintiff's] career in order to tarnish his reputation."[2] Defendants move for summary judgment dismissing the complaint.

### Facts

#### Plaintiff and His Activities

Plaintiff, José López, is a Colombian physician practicing medicine in the United States. In addition, he is a member of the Colombian Senate representing the State of Tolima,[3] a fact more easily understood in light of the ability of Colombian citizens living in the United States to hold dual citizenship and to vote in Colombian elections.[4]

Plaintiff's resume, which he submitted to this Court,[5] portrays him as a man educated at some of this nation's finest medical institutions and who subsequently has enjoyed impressive professional success. From 1993 to 1994, it says, plaintiff was educated at "Massachusetts General Hospital, Harvard Medical School, Cambridge, MA." From 1990 to 1993, it continues, he was at "New York Medical Hospital, New York University, New York, NY." Plaintiff's resume indicates also that he received a Ph.D. from "New York University School of Medicine, New York, NY."

The same resume details experience which purportedly includes concurrent work as the Director of the International Center of Laser Microsurgery in New York, New Jersey, Milan and Armenia, and at family health centers in New York and New Jersey. It indicates also that Dr. López was the Medical Director of the Department of Health in Hillside, New Jersey, and the Director of the Medical Department of the Lyons Institute of Technology in Clark, New Jersey. The resume claims too that López served as a professor of cellular and molecular biology

---

1. Def.Mem. 1.

2. Pl.Mem. 2.

3. Saldarriaga Aff. ¶ 7.

4. *Id.*

5. Canton Aff., Exh. P.

at Seton Hall University and as an assistant professor of cellular biology and anatomy and physiology at Kean College of New Jersey.

The information about plaintiff put forth on his resume is supplemented by information distributed by The José A. López Foundation. This foundation apparently released articles promoting Dr. López as "one of the great men of the twentieth century" and "one of the most renowned specialists in the United States in the field of aesthetic dermatologic surgery, and laser microsurgery."[6] The foundation, moreover, evidently has published a book called *The Best of Colombia* which contains a short biographical sketch describing Dr. López as "one of the most internationally important physicians to perform laser endoscopic surgery"[7] and as one who "dominates [the field of] endoscopic surgery."[8]

Dr. López is said to be well known in the Colombian community in New York for his medical, political and social activities. He has appeared as a medical expert on radio and television.

*The Channel 41 Programs*

Dr. López's activities drew the apparently desired attention, but they also invited scrutiny. In March 1998, at the time López was elected to the Colombian Senate,[9] Adrianna Saldarriaga, a managing editor at WXTV, Channel 41, a Spanish language television station broadcasting to the tri-state area which is owned by defendant Univision Communications, Inc,[10] decided to do a story about Dr. López. Saldarriaga's efforts resulted in three broadcasts on April 1, 2 and 3, 1998.[11] The format of each broadcast was the same. An announcer or reporter, usually

defendant Martinez, challenged some aspect of Dr. López's credentials. Interspersed with these challenges were audio and video of Dr. López's responses.

*The April 1 Broadcast*

The April 1 broadcast was quite brief and made three salient points: (1) Dr. López's authority to practice medicine in Colombia had been questioned, but Dr. López claimed that he was authorized to practice there; (2) the New York State professional licensing office, according to Channel 41, said that "López's license [to practice medicine] expired in December 1997," while Dr. López claimed that he had confirmed that very day that his "license is in fact active, from 7/1/93 to 7/31/99" and (3) López's New Jersey license "is still valid."[12]

*The April 2 Broadcast*

The April 2 broadcast was somewhat longer than its predecessor. Channel 41 began by reporting that Dr. López's background was under scrutiny in Colombia, where his medical training "is being looked at very closely ... for supposed lies about his academic background." Channel 41 claimed to have investigated Dr. López's resumé itself and to have found three alleged inconsistencies.[13]

First, Channel 41 reported that Dr. López's resumé "claims that between 1993 and 1994, he took courses in microsurgery at the Massachusetts General Hospital of the Harvard School of Medicine." It went on to say that it had spoken with named employees "of the student's registrar office and the hospital, respectively" and was

6. Saldarriaga Aff. ¶ 3, Ex. 1.

7. *Id.* ¶¶ 3, 4, Ex. 2.

8. *Id.*

9. *Id.* ¶ 7.

10. Def.Mem. at 1.

11. Saldarriaga Aff. ¶ 25 & Ex. 7–8.

12. Saldarriaga Aff., Exh. 7 at 1. Both parties have submitted transcripts of the Channel 41 broadcasts. Since only the transcript submitted by defendants is certified as accurate, citations in this opinion are to that transcript.

13. *Id.* at 2

told "that there is no file with the name of José Arley López Obando." [14]

Second, the broadcast attributed to Dr. López the claim that "he studied aesthetic surgery and dermatological surgery at the New York Medical Hospital of the university of the same name." [15] It reported that a named representative "of that institution" told Channel 41 that "there are no records" under Dr. López's name and date of birth. Dr. López then appeared on the screen and stated that:

> "At the time that I was studying, I was at Booth Memorial, I was at Tish [sic] Hospital, Evers, I was at the VA Hospital, and New York City Hospital. They did not call those and I studied at Booth Memorial."

The reporter then stated that "we called the institution again and they repeated to us that there is no file under the name José López–Obando." [16]

Third, Channel 41 claimed that Dr. López had shown it a diploma indicating that he holds a Ph.D. It then showed a clip from a Colombian interview with Dr. López in which a questioner asked Dr. López whether he had a Ph.D. as he had claimed and Dr. López responded that he had not finished his dissertation. The Channel 41 reporter then asserted that a named representative of the university that supposedly had granted the Ph.D. had said that "There are no records with the name of José López Obando." Dr. López then was shown stating that "[t]his is part of the case that is being built against José López." [17]

*The April 3 Broadcast*

The April 3 broadcast was introduced as the third and last part of Channel 41's "exclusive investigation into the authenticity of the credentials of one of the best-known Hispanic surgeons in our area." It reported that Dr. López claimed that he was authorized to practice laser cosmetic surgery. It went on to say that Channel 41 had confirmed Dr. López's New Jersey license and learned that the New York license that expired in December 1997 had been renewed on April 1, 1998. At that point a video clip was played in which Dr. López said that he had been licensed since 1989 and 1990.

Channel 41 then repeated that Dr. López was under investigation in Colombia. Referring to statements about Dr. López's background taken from *The Best of Colombia*. Channel 41 stated that it had confirmed "some of the facts that appear in that book" but went on to enumerate alleged inconsistencies. [18]

First, the program showed a clip of Dr. López saying that he had "satisfied the premed requirements at Kean College." It then alleged that Kean College had told Channel 41 that Dr. López "had only been in attendance for two semesters." [19]

Second, the broadcast quoted *The Best of Colombia* as stating that Dr. López was the director of the Department of Health in Hillside, New Jersey, but reported that a spokeswoman for the department said there never had been a Colombian director. [20]

Third, Channel 41 reported that *Septimo Dia*, a Columbian news magazine, had reported that the version of *The Best of*

14. *Id.*

15. The transcript of the broadcast rendered "the New York Medical Hospital" as a proper name. The broadcast, however, was oral, not written. While Dr. López's resumé refers to new York University ("NYU"), it was not entirely clear that the words as they were broadcast were used as a proper name rather than a description and, as will appear, exactly what institution they referred to.

16. Saldarriaga Aff., Exh. 7 at 2–3.

17. *Id.* at 3.

18. *Id.* at 4.

19. *Id.*

20. *Id.*

*Colombia* distributed in the United States had been altered, as compared with the Colombian version, to substitute Dr. López's picture on the cover for a photograph of a soccer player.[21]

Finally, the third show included a clip of Dr. López saying that the questions raised were "the opinion of a group that is trying to impugn the image of José López."[22]

*The Alleged Defamation*

While the Channel 41 reports questioned many of plaintiff's educational and professional credentials, Dr. López does not challenge most of the statements it made. Plaintiff tacitly admits, for example, that he misrepresented himself as the holder of a Ph.D., a degree he never earned. Nor does he challenge Channel 41's assertion that he substituted his own photograph for that of a soccer star's in *The Best of Colombia.* Among the welter of accusations in the three broadcasts, plaintiff's libel claims focus on only four statements. Dr. López challenges Channel 41's reporting that:

1. His license to practice medicine in New York had expired in December 1997.

2. Massachusetts General Hospital ("MGH") of the Harvard School of Medicine had no record of him.

3. "New York Medical Hospital of the university of the same name" had no record of him.

4. He had studied at Kean College for only two semesters.[23]

In fact, it is now undisputed that Dr. López's registration lapsed, but his license never expired. In addition, Dr. López has submitted an affidavit disputing the truth of the suggestions that he had not studied at MGH, Harvard, or the New York institution referred to, and asserting that he completed far more work at Kean than defendants reported.

*Preparation of the Broadcasts*

How did Channel 41 come to make the statements that plaintiff alleges are false?

Adriana Saldarriaga decided to investigate López after seeing a tape of *Septimo Dia,* a Columbian television news magazine show, which had questioned plaintiffs professional and academic credentials. When Saldarriaga decided to put together her own story about Dr. López, she began by contacting Manuel Teodoro, who had prepared the *Septimo Dia* report, and speaking with him about his investigation.[24] Following that conversation, Saldarriaga enlisted Patricia Tome, her student assistant, and Meryl Kaye, a private investigator retained to help,[25] and began her own investigation. Each day from March 31 until April 3, Saldarriaga, Tome and Kaye worked to verify the credentials that Dr. López's resumé and the book, *The Best of Columbia,* suggested plaintiff possessed.

*Investigation on March 31*

*Septimo Dia* had suggested there were problems with plaintiff's New York medical license, and both Tome and Kaye looked into this on March 31. Tome began by calling the State Education Department, Division of Professional Licensing, and speaking to Marilyn Tirpak.[26] Tome initially said in an affidavit that she was told that Dr. López's *license* had expired in December 1997 and had not been renewed.[27] At her deposition, Tome testi-

---

21. *Id.*

22. *Id.*

23. Plaintiff did not rely on the statement concerning his attendance at Kean College in the complaint. As the parties both have addressed the matter, and as plaintiff doubtless would be granted leave to amend to assert this claim, the Court deals with it here in the interests of efficiency.

24. Saldarriaga Aff. ¶¶ 11–13.

25. *Id.* at ¶¶ 15–16; Kaye Dep. at 12.

26. Tome Aff. ¶ 5.

27. *Id.* ¶ 5.

fied that she was told that "[a]s of today, [López] is not *registered* to practice medicine."[28] Her contemporaneous handwritten notes confirm the latter account, stating that "as of today he's not registered to practice medicine."[29] As will become clear, the distinction between loss of a license, which reflects on professional competence or ethics, and registration, which is an administrative matter, is important to plaintiff's claims here.

At the same time, Kaye did her own independent research. She also contacted the Division of Professional Licensing and learned that Dr. López was licensed but not registered.[30] She testified that she was told that Dr. López could not practice in New York because he had not paid his fees.[31] But she was not told that Dr. López's medical license had been revoked or suspended.[32]

Tome investigated also plaintiff's claimed training at MGH. She called Kim Watts, who works in the registrar's office of Harvard Medical School, and Tyrek Lee, an employee at the information desk at MGH. Each told her that his or her institution had no record of Dr. López.[33] Kaye, too, pursued this claim. She called Harvard Medical School and asked whether Dr. López had "attend[ed] any programs in laser microsurgery, if he had earned any degrees from the school, [and] if they had any record of him whatsoever."[34] The answer to each of these questions was no.

Finally, Tome tried to check the following entry on plaintiff's resumé: "1990–1993, Dermatologic and Aestetic [*sic*] Surgery, New York Medical Hospital, New York University. New York, NY." She contacted the dermatology residency training program and the Office of the University Registrar at NYU. She was told that there were no records indicating that Dr. López ever had studied at or received a degree from that institution.[35]

On March 31, Tome advised Saldarriaga of what she had found that day: that state licensing authorities said that Dr. López's license was expired and that MGH, Harvard Medical School, and NYU all had no record of him.[36] Kaye initially testified at her deposition that she too spoke with either Saldarriaga or Rachelle Bin, Channel 41's in-house counsel, on March 31[37] and that she reported that Dr. López had a license but was not registered to practice medicine in New York.[38] She testified also that she explained the difference between licensure and registration, which is discussed below, to either Saldarriaga or Bin.[39] Kaye later expressed uncertainty, however, as to when these conversations occurred[40] and indicated that they may have occurred after one or more of the broadcasts.

At a second session of her deposition, Kaye changed her story somewhat, saying that she could not be sure whether she told Saldarriaga that Dr. López's license

28. Tome Dep. 46 (emphasis added).

29. *Id.* at 17–19, 46 & Exh. 35.

30. Kaye Dep. 28–29.

31. *Id.* at 36, 42.

32. *Id.* at 42–43.

33. Lee "told [her] that a check of the computer records revealed no indication that Dr. López had ever worked or studied at" MGH. Watts said "that there was no record of Dr. López ever having been enrolled as a student or staff member." Tome Aff. ¶ 7.

34. Kaye Dep. 98–100.

35. Tome Aff. ¶ 8.

36. Saldarriaga Aff. ¶¶ 16, 18.

37. Kaye Dep. 44.

38. *Id.* at 46, 49–51.

39. *Id.* at 46–51.

40. *Id.* at 52.

was in force.[41]  She said also that she had not told Bin or Saldarriaga that Dr. López's registration—not his medical license—had expired on December 31.[42] Finally, she testified that the distinction between licensure and registration was never a topic of conversation between herself and either Bin or Saldarriaga.[43]  Thus, Kaye's later version of events suggested generally that she had not made the story's producers aware of the licensure—registration distinction.  Kaye presented also documentary evidence that, despite her understanding of the difference, she sent Saldarriaga and Bin a report dated April 1 in which she said that the *license* had expired.[44]

### Investigation on April 1, 1998

April 1 was the second day of investigation and the date of the first broadcast. Tome again called the Division of Professional Licensing in an attempt to double check the information that plaintiff's license was expired.  Her affidavit recites that she spoke with Bonnie Pettograsso, who confirmed that Dr. López's "license had expired and had not been renewed."[45] Saldarriaga says that Kaye told her on the same day that the then current status of plaintiff's license was "not registered," a report Saldarriaga believed confirmed Tome's research.[46]

At that point, Saldarriaga and her staff gathered the information they had and gave it to Antonio Martinez, the reporter for Channel 41 who would do the López report.  That evening, before broadcasting the first segment, Martinez went to Dr. López's office in Manhattan to interview him and to obtain his response to the report Channel 41 was preparing.[47]

During the interview, Dr. López gave Martinez a letter from Laura Piendergast at the New York State Division of Professional Licensing, dated that same day, which said that his license to practice medicine was in effect.[48]  The letter, however, was not on official letterhead,[49] and Channel 41 did not verify its contents on April 1 because it was too late in the day to reach the state agency.[50]  Dr. López also gave Martinez a document which, he said, confirmed his training at New York Medical Hospital, which he explained formerly was known as Booth Memorial Hospital.[51]  After the interview, but before the broadcast on April 1, Saldarriaga questioned Dr. López further by phone about people who might verify his professional experience. He provided the names of several people he said could confirm his studies at NYU, but none who could confirm his time at Harvard.[52]

Channel 41 aired the first part of its report that evening.

### Investigation on April 2

Faced with the letter that Dr. López had offered during his interview the night before, which said that in fact he was licensed to practice in New York State, Tome called the Division of Professional Licensing again on April 2. Bonnie Pettograsso confirmed that the letter's author, Laura Piendergast, worked for the division.[53]  Tome then spoke to Piendergast herself, who explained "that Dr. López's

41.  *Id.* at 156–57.

42.  *Id.* at 163.

43.  *Id.* at 170–71.

44.  *Id.* at 153.

45.  Tome Aff. ¶ 9.

46.  Saldarriaga Aff. ¶ 22.

47.  *Id.* at ¶ 27.

48.  Martinez Aff. ¶ 9.

49.  Canton Aff., Exh. B.

50.  Saldarriaga Dep. at 135–36.

51.  Saldarriaga Aff. ¶ 27.

52.  *Id.* at ¶ 28.

53.  Tome Aff. ¶ 13.

license had been renewed on April 1." [54] Saldarriaga learned of this development simultaneously because she was present during the call; Tome told Saldarriaga the new information and at some point also switched the phone call to a speaker. [55]

Tome was able to confirm also some of Dr. López's story about Booth Memorial. She learned that Booth Memorial is now known as "New York Medical Hospital in Queens," [56] although she was unable to confirm either that Dr. López had studied surgery there from 1990 to 1993 or that the hospital was associated with NYU. [57] Tome related these results to Saldarriaga. [58]

Tome on April 2 tried also to verify plaintiff's training at NYU by calling the doctors whose names Dr. López had provided. She was told that there were no records of doctors by those names affiliated with NYU. [59]

The second of Channel 41's reports aired that night.

### Investigation on April 3

On April 3, Tome tried to verify the information on Dr. López's resumé about Kean College. She called Kean College and spoke with Patricia Mendoza in the Registrar's Office, who Tome says told her that between 1979 and 1982 Dr. López completed only two semesters of course work at Kean. [60] Saldarriaga says that she confirmed this information with Kean College by speaking with Donna Meade. [61] Neither Mendoza [62] nor Meade [63] remembers the conversations one way or the other.

On April 3, the third and final Channel 41 broadcast aired, including that Dr. López's license had been renewed on April 1.

### Discussion

Defendants seek summary judgment dismissing the complaint on the grounds that (1) the allegedly defamatory statements were true or, alternatively, (2) plaintiff is a public official and a public figure and can not raise a genuine issue of fact as to whether defendants published the alleged libels with constitutional malice as required in public official/public figure libel cases by *New York Times Co. v. Sullivan* [64] and its progeny.

### Truth

■ A defamation plaintiff must prove that the statements at issue are false. [65] This is true even if the plaintiff is a private figure, at least if the statements are about a matter of public concern. [66] As there can be no serious dispute that the question whether Dr. López possessed the qualifications he claims is a matter of public con-

---

54. *Id.* at ¶ 14.

55. *Id.* at ¶ 15. With the same Piendergast letter in hand, Kaye also called the State Education Department for clarification. The date of her call is unclear from the record, although it surely occurred after April 1, when Channel 41 received the letter from plaintiff. She learned that Dr. López in fact was registered and that the inconsistency between what she had been told initially and his then current status resulted from the fact that his fees had been paid in the interim but had not yet been reflected on the system. Kaye Dep. 57–58.

56. Tome Aff. ¶ 17.

57. *Id.* at ¶ 18.

58. Saldarriaga Aff. ¶ 32.

59. Tome Aff. ¶ 18.

60. *Id.* at. ¶ 22.

61. Saldarriaga Aff. ¶ 38.

62. Mendoza Dep. at 14.

63. Meade Dep. at 17.

64. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

65. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Law Firm of Daniel P. Foster, P.C. v. Turner Broadcasting System,* 844 F.2d 955, 958 n. 5 (2d Cir.), *cert. denied,* 488 U.S. 994, 109 S.Ct. 559, 102 L.Ed.2d 585 (1988).

66. *Philadelphia Newspapers v. Hepps,* 475 U.S. at 776, 106 S.Ct. 1558; *Law Firm of Daniel Foster,* 844 F.2d at 958 n. 5.

cern, falsity of the allegedly defamatory statements is an essential element of his claim.

■ In New York,[67] truth or falsity is determined by the common law standard of substantial truth.[68] The Supreme Court recently elaborated on the substantial truth concept in *Masson v. New Yorker Magazine*.[69] A statement is true when " 'the substance, the gist, the sting, of the libelous charge be justified.' ... Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' " [70] Thus, a statement with minor inaccuracies nonetheless is substantially true for defamation purposes provided the inaccuracies do not affect the thrust of the statement.[71] *Per contra*, a literally true statement nonetheless may be actionable if it carries a false implication.[72] It is the truth of the central message that is important.

■ The fact that the matter is before the Court on a motion for summary judg-ment motion is important in two respects to the analysis which follows. First, the evidence. considered by the Court must be admissible in evidence.[73] Some evidence relied upon by the defendants is subject to valid hearsay objections to the extent offered to prove the truth of the matters asserted but nonetheless is admissible when considering fault because it goes to the defendants' state of mind. The universe of facts available for analysis of the truth of Channel 41's statements therefore is smaller than that available for analysis of fault. Second, while the plaintiff in a defamation case has the burden of establishing at trial the falsity of the statements, defendants seeking summary judgment have the burden of establishing the absence of a genuine issue of material fact, in this regard, of establishing the truth of the allegedly defamatory statements.[74]

### Statement 1—The New York License to Practice Medicine

To understand the parties' positions on the statements about Dr. López's New

---

**67.** The alleged libels in this case have multistate elements in that the defendants' broadcasts reached the tristate metropolitan area, Dr. López practices and presumably alleges injury both in New York and New Jersey, and Dr. López claims to be a resident of the latter state. Nevertheless, the parties have relied exclusively on New York and federal cases and there has been no suggestion either that the law of another state governs or, if so, that it differs from the law of New York. In consequence, the Court applies New York law. *See Hannex Corp. v. GMI, Inc.* 140 F.3d 194, 203 n. 7 (2d Cir.1998) (when both sides argue New York law in their briefs "the parties seem to agree ... that New York law, the law of the forum state, governs [the] claims."); *Tehran–Berkeley v. Tippetts–Abbett, et al.*, 888 F.2d 239, 242 (2d Cir.1989) ("implied consent to use a forum's law is sufficient to establish choice of law").

**68.** *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied*, 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977).

**69.** *501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).*

**70.** *Id.* at 517, 111 S.Ct. 2419 (internal citations omitted).

**71.** *See Printers II, Inc. v. Professionals Pub., Inc.* 784 F.2d 141, 146–47 (2d Cir.1986) (statement that individuals had not paid their bill, implying that it was overdue, was substantially true even though bill was not yet due, but was so vigorously contested as to make clear it would not be paid. Court found the statement substantially true because its gist was the same as a more technically accurate statement would have been.)

**72.** In a well-known Tennessee case, a newspaper reported that one woman had shot another upon finding her husband at the other's home. The article omitted the facts that several other people were present and that the shooting had been accidental. In these circumstances, a court found the literal accuracy of the article insufficient to prove its truth. *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn.1978).

**73.** Fed R.Civ.P. 56(e).

**74.** Fed.R.Civ.P. 56(c).

York medical license, it is necessary to appreciate the difference between licensing and registration of physicians in this state.

A physician must be both licensed and registered in order to practice medicine in New York.[75] Once he or she is licensed, the license may be revoked, annulled, or suspended, and the licensee may be stricken from the rolls by the State Board for Professional Medical Conduct, but it does not expire.[76] Registration, on the other hand, is an administrative matter. A doctor first is registered upon applying for a license.[77] Thereafter, he or she must renew that registration every two years by filing papers and paying fees.[78]

As the foregoing suggests, the significance of the expiration of a physician's registration arguably is quite different than the significance of the loss of a medical license. The loss of a medical license reflects on the individual's professional competence or ethics.[79] The expiration of a registration, on the other hand, suggests only an administrative default. This distinction, moreover, is reflected in the quite different penalties for practicing without a license and practicing without a current registration. The former is a felony subject to criminal prosecution; the latter involves only a small late fee.[80]

It appears to be undisputed that Dr. López's license to practice medicine remained in force at all relevant times. His registration seems to have expired around the end of 1997, but was renewed on April 1, 1998.[81] The initial Channel 41 broadcast, which suggested that Dr. López was practicing without a valid medical license rather than simply having allowed his registration to expire, therefore was literally false. But defendants nevertheless argue that it was substantially true because the expiration of Dr. López's registration deprived him of the privilege of lawfully practicing medicine. It matters not, in defendants' submission, whether he lost that privilege by revocation of his license or by expiration of his registration.

The Court disagrees. A trier of fact reasonably could find that there is a material difference between the expiration of a registration for non-payment of fees and the revocation of a license to practice medicine. The former implies no more than inattention to detail. The latter connotes misconduct, incompetence or worse.

*Statement 2—MGH and Harvard Medical School*

It is helpful to consider statement 2 in two steps. First, Channel 41 reported that "we spoke with Kim Watts and Tyrek Lee of the student registration office and the hospital, respectively" and that Watts and Lee "told us there is no file with the name of José López Obando." These statements were literally true, in the sense that defendants' evidence that they made these calls and that Watts and Lee made the statements attributed to them is unrebutted by any competent evidence. But is

75. Mooney Dep. 30–31.

76. *Id.* at 8; N.Y.EDUC.L. § 6502, subd. 1 (McKinney Supp.1999).

77. Mooney Dep. 35; N.Y.EDUC.L. § 6502, subd. 3 (McKinney Supp.1999).

78. Mooney Dep. 6, 35–37.

79. A medical license may be revoked, annulled or suspended on a finding of professional misconduct, which is defined to include gross incompetence and gross negligence. N.Y.EDUC.L. § 6509 (McKinney 1985 & Supp.1999) (definition of professional misconduct); *id.* § 6511 (penalties).

80. N.Y.EDUC.L. § 6512, subd. 1 (McKinney 1985 & Supp.1999) (practice while license is suspended is a class E felony); *id.* § 6502, subd. 3 (McKinney 1985 & Supp.1999) (licensees who fail to register on time shall pay a fee for each month that registration is delayed while licensee continues to practice his profession.) A willful failure to register, it might be noted, constitutes professional misconduct that may lead to revocation of a license. *Id.* § 6509, subd. 8.

81. Mooney Dep. 23–24.

that enough to save defendants if, in fact, the information given them by Watts and . Lee proved incorrect? ˙ Put another way, does the truthful attribution of a false and defamatory statement to another preclude a successful defamation claim against the speaker?

As noted, the appropriate focus is on substantial truth, on the sting of the challenged statement. Plaintiff's reputation was harmed, if at all, by the allegation that MGH and Harvard, with which he claimed a connection, had no record of him. What Channel 41 was or was not told is not what stung, relevant though it is to the determination of fault. Hence, the issue for purposes of assessing truth is whether the substance of the allegation was true, not whether defendants heard the pertinent information from someone else.

The republication doctrine dictates the same result. "The common law of libel has long held that one who republishes a defamatory statement 'adopts' it as ˙ his own and is liable in equal measure to the original defamer." [82] Thus, it is the content, the central thrust of the statement, not the "she told us this" portion, that is the relevant focus in determining substantial truth.

Having framed the pertinent inquiry, it quickly becomes clear that defendants have not established the substantial truth. of their contention that Dr. López did not receive training at MGH and Harvard, as his resumé claims. Rule 56(e) requires that affidavits in support of and in opposition to motions for summary judgment be "made on personal knowledge, set forth such facts as would be admissible in evidence, and . . . show affirmatively that the

affiant is competent to testify to the matters stated therein." Defendants rely on the depositions of Tome and Kaye and on Tomes' affidavit. Their accounts of what they were told by Watts and Lee, to the extent they are offered to prove that MGH and Harvard in fact have no record of Dr. López, are inadmissible hearsay. In consequence, defendants have offered no admissible evidence of the truth of the relevant part of their statement. Even if they had, their version is contradicted by Dr. López, thus creating an issue of fact on the point. [83]

### Statements 3 and 4—NYU and Kean College

Statements 3 and 4 are subject to much the same analysis. Even putting aside the added complexities introduced by the vagueness and ambiguity of statement 3, defendants' evidence as to what they were told by representatives of NYU and Kean College, to the extent offered for the truth of the matters asserted, is inadmissible hearsay and an insufficient basis upon which to grant summary judgment of dismissal on the ground that the statements were substantially true.

### Fault

In addition to falsity, the plaintiff in a libel case must demonstrate that the defendants culpably published the false and defamatory statements complained of. The requisite degree ˙ of culpability varies with the circumstances. If the plaintiff is a public official or a public figure, the plaintiff must prove actual—more properly, constitutional—malice,[84] a requirement satisfied only by proof that defendants had

---

**82.** *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1298 (D.C.Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Levin v. McPhee,* 917 F.Supp. 230, 237 (S.D.N.Y.1996), *aff'd,* 119 F.3d 189 (2d Cir.1997).

**83.** López Aff. ¶ 10.
Defendants' contention that the years in which Dr. López's affidavit claims that he studied at MGH–Harvard differ from the

time period stated on his resumé is a mere quibble, as it does not go to *substantial* truth. Channel 41 did not claim that Dr. López lied about the years in which he studied at MGH–Harvard; the suggestion was that he lied about having studied there at all.

**84.** *Gertz v. Robert Welch,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

a "high degree of awareness of ... probable falsity"[85] or "entertained serious doubts as to the truth of the publication."[86] As a matter of federal constitutional law, even a private figure plaintiff must show at least that the defendants were negligent with respect to the truth if the statement complained of bears on a matter of public concern.[87] But this constitutional requirement of negligence merely places a floor under the required level of culpability. The states remain free to establish more demanding standards.

New York has done just that. In *Chapadeau v. Utica Observer–Dispatch,*[88] the New York Court of Appeals held that a private figure plaintiff complaining of defamation in respect of a matter of public concern may not recover unless the plaintiff establishes that the defendants acted "in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."[89]

### Public Official—Public Figure

■ The first question is whether plaintiff's status as a member of the Colombian Senate makes him a public official for purposes of *New York Times Co. v. Sullivan.* While the parties stoutly dispute the appropriate conclusion, they have not briefed the matter in a helpful manner.

A number of cases have assumed that holders of public office in foreign countries are public officials for purposes of the constitutional law of libel.[90] Those cases, however, in fact have been decided on the basis that the plaintiffs were public figures, thus rendering unnecessary to the results their cursory statements concerning whether the holding of foreign public office alone makes one a public official for purposes of the U.S. law of libel. On the other hand, it is reasonably well established that not all holders even of domestic public office must satisfy the *New York Times* standard with respect to all alleged libels. As the Second Circuit said in *Bufalino v. Associated Press,*[91] a case brought by a minor, part-time public official, the plaintiff need not satisfy *New York Times* "where the defendant's statements do not directly or impliedly identify the plaintiff as a public official, and there is no showing that plaintiff's name is otherwise immediately recognized in the community as a public official."[92] This arguably implies that a statement about a foreign public official plaintiff that does not so identify the plaintiff does not enjoy the protection of the constitutional malice standard, at least in the absence of proof that the plaintiff is recognized in this community as a public official.

The heightened standard of culpability required of plaintiffs suing public officials for defamation is justified by "our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp at-

**85.** *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), *Lerman v. Flynt Distributing Co., Inc.,* 745 F.2d 123, 139 (2d Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985).

**86.** *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Lerman v. Flynt Distributing Co.,* 745 F.2d at 139.

**87.** *Gertz v. Welch,* 418 U.S. at 347, 94 S.Ct. 2997.

**88.** 38 N.Y.2d 196, 379 N.Y.S.2d 61, 64, 341 N.E.2d 569 (1975).

**89.** *Chapadeau v. Utica Observer–Dispatch,* 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 64, 341 N.E.2d 569 (1975).

**90.** *E.g., Desai v. Hersh,* 719 F.Supp. 670 (N.D.Ill.1989); *Sharon v. Time, Inc.,* 599 F.Supp. 538 (S.D.N.Y.1984).

**91.** 692 F.2d 266 (2d Cir.1982), *cert. denied,* 462 U.S. 1111, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983).

**92.** *Id.* at 273.

tacks on government and public officials."[93] It is a commitment born of the necessity of public debate on matters affecting our society in the service of informed and intelligent self government.[94] But while uninhibited debate about many prominent foreign officials will be relevant to such matters as making informed judgments about U.S. foreign policy and international relations, this Court is not prepared to say that the holding of any foreign public office is alone sufficient to require application of the *Times* standard, at least to a publication that does not identify the plaintiff as a public official and that does not directly concern the plaintiff's performance of official duties. In consequence, the fact that the plaintiff is a member of the Colombian Senate does not alone require him to prove constitutional malice with respect to these broadcasts, which concerned his practice of medicine rather than his official duties and did not identify him as a Colombian public official. Nevertheless, plaintiff's status as a member of the Colombian Senate is not irrelevant here. Cases subsequent to *New York Times Co. v. Sullivan* have required also that plaintiffs who are public figures satisfy the constitutional malice standard in order to recover for defamation.[95] And certainly plaintiff's public position is relevant to the determination whether he is a public figure.[96]

■ There is an abundance of material before the Court suggesting that Dr. López indeed is a public figure. Not only is he a high ranking legislator of the Republic of Colombia and a physician with an apparently extensive practice in this area, but documents submitted by defendants suggest that his Senate campaign included the solicitation of votes of Colombian citizens in this area; that he engages in extensive self-promotion of his political, civic, professional and charitable activities; and that he has made other appearances on local broadcast media. The difficulty, however, is that this record does not permit a determination of this issue at this stage.

In *Rosenblatt v. Baer*,[97] the Supreme Court said that it is for the trial judge "in the first instance" to determine whether a defamation plaintiff is a public figure.[98] Some courts have indicated that the "first instance" qualification is of no import and that the determination is a matter of law for the court.[99] Others have characterized the issue as a mixed question of law and fact,[100] which presumably would require jury determination of any disputed questions of evidentiary fact. At least one state court of last resort has held that the issue is purely one of fact.[101] But whatever the proper characterization, the matter may be decided on summary judgment only if the movant carries its burden of demonstrating that there are no genuine

**93.** *New York Times Co.*, 376 U.S. at 270, 84 S.Ct. 710.

**94.** *See Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("speech concerning public affairs is more than self-expression; it is the essence of self-government"); *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 759, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (concern for debate on public issues motivates *New York Times* and *Gertz* decisions).

**95.** *See Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

**96.** *See, e.g., Desai v. Hersh*, 719 F.Supp. at 673; *Sharon v. Time*, 599 F.Supp. at 563.

**97.** 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).

**98.** *Id.* at 88, 86 S.Ct. 669.

**99.** *See, e.g., Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 330 N.E.2d 161 (1975).

**100.** *See, e.g., Reliance Ins. Co. v. Barron's*, 442 F.Supp. 1341, 1346 (S.D.N.Y.1977); *Hotchner v. Castillo–Puche*, 404 F.Supp. 1041 (S.D.N.Y. 1975).

**101.** *Nash v. Keene Pub. Corp.*, 127 N.H. 214, 498 A.2d 348 (1985); *McCusker v. Valley News*, 121 N.H. 258, 428 A.2d 493, cert. denied, 454 U.S. 1017, 102 S.Ct. 552, 70 L.Ed.2d 415 (1981).

disputes as to any facts material to the determination.

In this case, some of the evidence upon which defendants rely in seeking to characterize Dr. López as a public figure is undisputed. Plaintiff's radio and television appearances are admitted on the resumé he himself submitted to the Court. Saldarriaga, upon whose affidavit defendants rely, has personal knowledge of Dr. López's prior appearances on Channel 41. In consequence, there is no issue as to some of plaintiff's broadcast appearances. Other potentially persuasive facts, however, are inadmissible. Defendants point to plaintiff's alleged self-description as "a leader of Colombian causes in New York and New Jersey," [102] but the materials they cite have not been authenticated properly.[103] They claim also that plaintiff appeared on a local radio show on the morning of April 3 to refute the Channel 41 charges, a fact that would support their public figure argument because it would demonstrate use of the media to reply to charges in a manner characteristic of public figures.[104] But the only evidence of this appearance is a hearsay telephone message from an unknown caller which Saldarriaga described in her affidavit.[105]

As indicated above, evidence in support of and in opposition to motions for summary judgment must be competent and admissible in evidence absent a waiver of any objections by the opposing side. In this case, Dr. López has contested the sufficiency of defendants' showing with respect to his alleged public figure status, arguing that much of defendants' evidence is in the form of assertions as to Saldarriaga's understanding.[106] While plaintiff has

denied none of the operative facts, the objection to the competency of much of Saldarriaga's testimony on this point is well taken. Thus, although it appears quite likely that defendants ultimately will establish that Dr. López is a public figure, they have not carried their burden on that point for purposes of this motion.

It is clear, however, that the qualification of a physician to practice his profession is a matter of public concern. Hence, even if plaintiff were neither a public official nor a public figure, the *Chapadeau* gross irresponsibility test would apply in this case. Accordingly, the Court assesses each of the four allegedly defamatory statements against that standard.

### The Gross Irresponsibility Standard

*Chapadeau* permits recovery only when defendants act "in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." The New York Court of Appeals has remarked that *Chapadeau* "demands no more than that a publisher utilize methods of verification that are reasonably calculated to produce accurate copy." [107] Another court has called it "a gross negligence standard." [108] " '[G]ross negligence' means that the defendant is so extremely careless that it is equivalent to recklessness, while ordinary negligence is the doing of some act which a reasonably prudent person would not do under the circumstances or a failure to use ordinary and reasonable care under the circumstances. Gross negligence involves

102. Def.Mem. at 26, *citing* Saldarriaga Aff. & Ex. 1, 2.

103. The statements appear in materials from a foundation which Saldarriaga "understand[s]" is run by Dr. López. No other support for their source is provided. *See* Saldarriaga Aff. ¶ 3.

104. *See Gertz v. Welch,* 418 U.S. 323, 344, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

105. Saldarriaga Aff. ¶ 33.

106. Pl.Mem. 12.

107. *Karaduman v. Newsday, Inc.,* 51 N.Y.2d 531, 547, 435 N.Y.S.2d 556, 565, 416 N.E.2d 557 (1980).

108. *Greenberg v. CBS,* 69 A.D.2d 693, 710, 419 N.Y.S.2d 988, 997 (2d Dept.1979).

the thoughtless disregard of consequences without any attempt to avoid them." [109]

■ An important component of judging the practices in this case is ascertaining the degree to which defendants were entitled to rely on the statements of others. A defendant does not necessarily escape liability merely by repeating the statements of a source, even if it properly attributes them and even if it does not endorse those views.[110] Some confirmation of the content of the statements may be required.

■ On the other hand, a publisher must be able to rely on its staff. When a libel defendant relies upon its reporter, the New York Court of Appeals held in *Rinaldi v. Holt, Rinehart & Winston,* the defendant cannot be held liable unless it "had, or should have had, substantial reasons to question the accuracy" of its source.[111] While *Rinaldi* was governed by the constitutional malice standard, the Court of Appeals affirmed the application of the same principle to gross irresponsibility cases soon afterward in *Karaduman v. Newsday, Inc.,* where it held that a defendant who had republished a statement originally printed elsewhere could not be found to have been grossly irresponsible "[a]bsent some showing that [the defendant] personally had reason to doubt the truthfulness of the statements in the articles." [112]

*Fault as to Statement 1*

■ The statement that Dr. López had lost his license to practice medicine in New York was capable of casting aspersions on his professional qualifications or ethics.

At the time of the broadcasts, Patricia Tome, for one, did not understand the difference between licensure and registration. She so testified at her deposition.[113] Indeed, it appears that she may not understand the distinction even now. Her affidavit and testimony in this case vacillate between the language of registration and the language of licensure.

The same cannot be said of Meryl Kaye. Unlike Tome, she testified that she understood the difference between licensure and registration. The evidence before the Court would permit a trier of fact to conclude that Kaye learned in advance of the April 1 broadcast that Dr. López's license remained in effect, although his registration had expired, and conveyed this information either to Saldarriaga, the producer of the show, or to Bin, the in-house counsel. Channel 41 nevertheless broadcast the statement that Dr. López's license had expired. A trier of fact therefore would be entitled to find that responsible officials of the station knew that the broadcast was false in that the license had not expired. Assuming that were so, the best face that could be put on the evidence is that the defendants genuinely were confused as to the licensure-registration distinction. The trier, however, would be entitled to conclude that proceeding with the broadcast in the face of that confusion was grossly irresponsible. In consequence, defendants' motion for summary judgment must be denied as to statement 1.

109. *Veals v. Consolidated Edison Co.,* 114 Misc.2d 626, 628, 452 N.Y.S.2d 153, 155 (Civ. Ct. Kings Co.1982) (internal citations omitted).

110. *See Weiner v. Doubleday & Co.,* 74 N.Y.2d 586, 593, 550 N.Y.S.2d 251, 254, 549 N.E.2d 453 (1989), *cert. denied* 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 498 (1990) (no "neutral reportage" privilege in New York which would entitle repetition of statements of third parties so long as no endorsement given); *Lee v. City of Rochester,* 195 A.D.2d 1000, 1002, 600 N.Y.S.2d 564, 566 (4th Dept.1993) (a publisher's "conclusory assertion that it was

entitled to rely on [a police officer's] statements does not ... negate [an] allegation of gross irresponsibility.")

111. *Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 383, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977).

112. *Karaduman v. Newsday, Inc.,* 51 N.Y.2d 531, 542, 435 N.Y.S.2d 556, 561, 416 N.E.2d 557 (1980).

113. Tome Dep. at 46, 55.

*Fault as to Statement 2*

■ In assessing fault on statement 2, the value of the defendants' evidence changes dramatically from its value to the truth question. While the testimony of Tome and Kaye is inadmissible hearsay when offered to prove the truth of what they were told by Harvard and MGH, it is admissible for the purpose of establishing their states of mind. In consequence, the evidence establishes that Channel 41 made its statement concerning the apparent inaccuracy of Dr. López's resumé claim regarding training at MGH—Harvard only after having obtained confirmation from those institutions. Indeed, Dr. López does not argue that he in fact *was* enrolled at either MGH or at Harvard in 1993 and 1994, as his resumé clearly implies. Instead, he now claims only that he attended a brief program which was held at MGH and faults defendants for not making a more thorough search, one that allegedly would have revealed whether he "took non-matriculated courses which would not show up as student or intern-resident." [114]

Dr. López's claim is baseless. Defendants' actions with respect to Dr. López's at best misleading puffery concerning his connection with two of the leading medical institutions in the United States were all that was required. They certainly did not act in a grossly irresponsible fashion with respect to this statement.

*Fault as to Statement 3*

There is no dispute that Tome contacted NYU and was told that it had no records of the plaintiff. What is disputed is whether defendants contacted the proper hospital and whether they accurately conveyed *which* hospital denied a connection to plaintiff.

The broadcast asserted that Dr. López claimed to have "taken courses on cosmetic and dermatological surgery at the New York Medical Hospital in the university of the same name." It then proceeded to suggest that the claim was false by asserting that the institution in question claimed to have no record of Dr. López. In doing so, of course, it was referring to NYU, the institution named on Dr. López's resumé, although it never identified the institution on the air. [115]

The bases for Channel 41's charge lay in its communications with NYU. On April 1, however, Dr. López told Channel 41 that his residency training had been at Booth Memorial Hospital [116] and presented them with a certificate from that institution. By April 2, defendants confirmed that Dr. López had done his residency there and that Booth Memorial had changed its name to New York Medical Center of Queens, although they were unable to confirm any connection to NYU. [117]

The first reference on the broadcast— "New York Medical Hospital of the university of the same name"—might have been understood to refer to NYU. That reference, however, was followed by Dr. López statement that he "studied at Booth Memorial." Martinez then said that "although López showed us the document that certifies his courses, we called *the institution again* and they repeated to us that there is no file under the name José López–Obando."

The identity of the institution to which Martinez referred was unclear. A viewer

---

114. Canton Aff. ¶ 25.

115. In view of the failure to name either the institution at which Dr. López claimed to have been trained or that from which Channel 41 sought confirmation, the broadcast statement was none too clear. Most viewers presumably did not have Dr. López's resumé before them. Moreover, (a) neither side claims that there is or ever was an institution named simply "New York Medical Hospital," (b) there are hospitals called New York Hospital, which is affiliated with the Cornell Medical School, and New York Medical Hospital of Queens, and (c) there are two medical schools in the area that arguably fit Channel 41's description, the New York University School of Medicine and New York Medical College. The possibilities for misunderstanding therefore were rife.

116. Saldarriaga Dep. at 141–43.

117. Tome Aff. ¶ 17.

might have taken the sequence to mean that Channel 41 and Dr. López were speaking of different institutions, but a viewer also might have construed Channel 41 to have been saying that Dr. López's claim to have trained at Booth was false. The ambiguity of the statements arguably was apparent to Channel 41 at the time. Given the uncertainty and the fact that Channel 41 had no basis for questioning the truth of Dr. López's contention that he trained at Booth Memorial, the matter cannot be disposed of on this motion.

### Fault as to Statement 4

Defendants claim that employees of Kean College told them that plaintiff had completed only two semesters of work there. Plaintiff responds that circumstantial evidence shows that defendants' version of events is "impossible." He has submitted a purported photocopy of a transcript that shows nine semesters of courses at Kean, as well as some transfer credits.[118] Moreover, he argues that Kean College could not have given defendants the information they claim to have received because its personnel were limited to "verify[ing] certain information over the telephone with a yes or no answer." [119]

There is no necessary inconsistency between the parties' positions. Some of the student records for the period at issue were on computers while others were available only in hard Copy.[120] Kean College's offices were undergoing renovations at the time of the confirmatory telephone calls.[121] Ms. Meade, moreover, testified to a recollection of having had a partial transcript for Dr. López.[122] Hence, it is entirely possible that Kean College confirmed or gave Channel 41 the information it broadcast.

On the other hand, the Court is obliged to view the evidence in the light most favorable to the non-moving party. Defendants' evidence fails to preclude the possibility that a trier of fact could find that Kean's employees did not say what defendants allege. If a trier so found, it certainly could find either that defendants published with knowledge of falsity or that they did so with knowledge that no reliable source had confirmed the information that they broadcast. In either event, plaintiff would satisfy the *Chapadeau* standard with respect to statement 4.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment dismissing the amended complaint is granted with respect to statement 2, but denied in all other respects. The parties are directed promptly to meet and confer regarding settlement and thereafter to appear in Courtroom 12D for a Rule 16 conference on May 10, 1999 at 12:00 p.m. fully prepared to discuss resolution of this matter.

SO ORDERED.

---

118. Canton Aff.Exh. N. The transcript is unauthenticated.

119. *Id.* ¶ 22.

120. Mendoza Dep. at 16.

121. Meade Dep. at 24.

122. *Id.* at 8–9.