*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JERRY REIGHARD,

      Plaintiff-Appellant,

v

ESPN, INC., and DANIEL MURPHY,

      Defendants-Appellees.

FOR PUBLICATION
May 12, 2022

No. 355053
Isabella Circuit Court
LC No. 2019-015498-CZ

Before: BOONSTRA, P.J., and M. J. KELLY and SWARTZLE, JJ.

BOONSTRA, P.J. (*concurring*).

I fully concur in the majority opinion. I write separately simply to expand upon its rationale, to provide some historical context, and to suggest that the United States Supreme Court look anew at the morass that the law of defamation has become. Much has happened since the Supreme Court began issuing opinions in this area of law nearly sixty years ago. The "actual malice" standard that the Court created began small, but has been ever-expanding in its reach and now, in practice, seems to have become nearly insurmountable. At the same time, the news media has been transformed. It exists today in an internet world that no one could have imagined at that time. With a mere social media keystroke, virtually anyone and everyone can publish at will. There is an increasing rush to publish in order to be the first to print. Too often, the casualty is accuracy in reporting, as shortcuts are taken in the investigation and verification process that would serve to guarantee accuracy. We are thus left in today's world with an emboldened media (although that word is becoming increasingly difficult to define) that, as a result of the protections the Supreme Court afforded to it—perhaps for good reason at the time—increasingly perceives a court-sanctioned license to publish whatever it wishes, without fear of consequence. At the same time, much of the fourth estate has lost sight of its journalistic mission, and instead engages in issue and political advocacy under the guise of "reporting." And the "Big Tech" companies that operate popular social media platforms purport to be able to define the real "truth," and therefore censor those who do not subscribe to their favored narratives.

Freedom of speech is fundamental. Freedom of the press is equally so. Those fundamental First Amendment rights remain as important today as they were when the Bill of Rights was ratified in 1791. But we are all losers when the law becomes so distorted as to eliminate all manner

of accountability for those who would recklessly damage personal reputations ostensibly in the name of freedom of speech or freedom the press, no matter the reason or motive.

## I.  DEFAMATION AND THE FIRST AMENDMENT

As the majority opinion adeptly describes, defamatory speech was originally considered to be unprotected by the First Amendment.  That is, defamatory statements remained actionable under state common law irrespective of the First Amendment.  That began to change when the United States Supreme Court issued its decision in *New York Times Co v Sullivan*, 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964).  Since then, the reach of that decision, and of the "actual malice" test that the Court adopted, has been ever-expanding; indeed, what began as a narrow exception appears now to have swallowed the rule.

## A.  HISTORICAL BACKDROP

To properly understand the monumental scope of that transformation, I commend to the reader additional portions of Justice WHITE's historical summation in *Gertz v Robert Welch, Inc*, 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974) (WHITE, J., dissenting).  While lengthy, it merits a careful read, in order to put the questions before us in a proper context.  Justice WHITE stated, in part:

> The Court does not contend, and it could hardly do so, that those who wrote the First Amendment intended to prohibit the Federal Government, within its sphere of influence in the Territories and the District of Columbia, from providing the private citizen a peaceful remedy for damaging falsehood.  At the time of the adoption of the First Amendment, many of the consequences of libel law already described had developed, particularly the rule that libels and some slanders were so inherently injurious that they were actionable without special proof of damage to reputation.  As the Court pointed out in *Roth v. United States*, 354 U.S. 476, 482, 77 S.Ct. 1304, 1307, 1 L.Ed.2d 1498 (1957), 10 of the 14 States that had ratified the Constitution by 1792 had themselves provided constitutional guarantees for free expression, and 13 of the 14 nevertheless provided for the prosecution of libels.  Prior to the Revolution, the American Colonies had adopted the common law of libel.  Contrary to some popular notions, freedom of the press was sharply curtailed in colonial America.  Seditious libel was punished as a contempt by the colonial legislatures and as a criminal offense in the colonial courts.

> Scant, if any, evidence exists that the First Amendment was intended to abolish the common law of libel, at least to the extent of depriving ordinary citizens of meaningful redress against their defamers.  On the contrary, "(i)t is conceded on all sides that the common-law rules that subjected the libeler to responsibility for the private injury, or the public scandal or disorder occasioned by his conduct, are not abolished by the protection extended to the press in our constitutions." 2 T. Cooley, Constitutional Limitations 883 (8th ed. 1927).

> Moreover, consistent with the Blackstone formula, these common-law actions did not abridge freedom of the press.  See generally L. Levy, Legacy of Suppression:

Freedom of Speech and Press in Early American History 247-248 (1960); Merin, Libel and the Supreme Court, 11 Wm. & Mary L.Rev. 371, 376 (1969); Hallen, Fair Comment, 8 Tex.L.Rev. 41, 56 (1929). Alexander Meiklejohn, who accorded generous reach to the First Amendment, nevertheless acknowledged:

> No one can doubt that, in any well-governed society, the legislature has both the right and the duty to prohibit certain forms of speech. Libelous assertions may be, and must be, forbidden and punished. So too must slander. . . . All these necessities that speech be limited are recognized and provided for under the Constitution. They were not unknown to the writers of the First Amendment. That amendment, then, we may take it for granted, does not forbid the abridging of speech. But, at the same time, it does forbid the abridging of the freedom of speech. It is to the solving of that paradox, that apparent self-contradiction, that we are summoned if, as free men, we wish to know what the right of freedom of speech is.

Political Freedom, The Constitutional Powers of the People 21 (1965). See also Leflar, The Freeness of Free Speech, 15 Van.L.Rev. 1073, 1080-1081 (1962).

Professor Zechariah Chafee, a noted First Amendment scholar, has persuasively argued that conditions in 1791 "do not arbitrarily fix the division between lawful and unlawful speech for all time." Free Speech in the United States 14 (1954). At the same time, however, he notes that while the Framers may have intended to abolish seditious libels and to prevent any prosecutions by the Federal Government for criticism of the Government, "the free speech clauses do not wipe out the common law as to obscenity, profanity, and defamation of individuals."

The debates in Congress and the States over the Bill of Rights are unclear and inconclusive on any articulated intention of the Framers as to the free press guarantee. We know that Benjamin Franklin, John Adams, and William Cushing favored limiting freedom of the press to truthful statements, while others such as James Wilson suggested a restatement of the Blackstone standard. Jefferson endorsed Madison's formula that "Congress shall make no law . . . abridging the freedom of speech or the press" only after he suggested:

> The people shall not be deprived of their right to speak, to write, or otherwise to publish anything but false facts affecting injuriously the life, liberty or reputation of others . . . .. F. Mott, Jefferson and the Press 14 (1943).

Doubt has been expressed that the Members of Congress envisioned the First Amendment as reaching even this far. Merin, Libel and the Supreme Court, 11 Wm. & Mary L.Rev. 371, ss 379-380 (1969).

This Court in bygone years has repeatedly dealt with libel and slander actions from the District of Columbia and from the Territories. Although in these cases First Amendment considerations were not expressly discussed, the opinions of the Court

unmistakably revealed that the classic law of libel was firmly in place in those areas where federal law controlled. See e.g., *Washington Post Co. v. Chaloner*, 250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987 (1919); *Baker v. Warner*, 231 U.S. 588, 34 S.Ct. 175, 58 L.Ed. 384 (1913); *Nalle v. Oyster*, 230 U.S. 165, 33 S.Ct. 1043, 57 L.Ed. 1439 (1913); *Dorr v. United States*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); *Pollard v. Lyon*, 91 U.S. 225, 23 L.Ed. 308 (1876); *White v. Nicholls*, 3 How. 266, 11 L.Ed. 591 (1845).

The Court's consistent view prior to *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), was that defamatory utterances were wholly unprotected by the First Amendment. In *Patterson v. Colorado, ex rel. Attorney General*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907), for example, the Court said that although freedom of speech and press is protected from abridgment by the Constitution, these provisions "do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare." This statement was repeated in *Near v. Minnesota, ex rel. Olson*, 283 U.S. 697, 714, 51 S.Ct. 625, 630, 75 L.Ed. 1357 (1931), the Court adding:

> But it is recognized that punishment for the abuse of the liberty accorded to the press is essential to the protection of the public, and that the commonlaw rules that subject the libeler to responsibility for the public offense, as well as for the private injury, are not abolished by the protection extended in our Constitutions. *Id.*, at 715, 51 S.Ct. at 630.

*Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942) (footnotes omitted), reflected the same view:

> There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

*Beauharnais v. Illinois*, 343 U.S. 250, 254-257, 72 S.Ct. 725, 729-731, 96 L.Ed. 919 (1952) (footnotes omitted), repeated the *Chaplinsky* statement, noting also that nowhere at the time of the adoption of the Constitution "was there any suggestion that the crime of libel be abolished." And in *Roth v. United States*, 354 U.S., at 483, 77 S.Ct., at 1308 (footnote omitted), the Court further examined the meaning of the First Amendment:

> In light of this history, it is apparent that the unconditional phrasing of the First Amendment was not intended to protect every utterance. This phrasing did not prevent this Court from concluding that libelous utterances

are not within the area of constitutionally protected speech. *Beauharnais v. Illinois*, 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919. At the time of the adoption of the First Amendment, obscenity law was not as fully developed as libel law, but there is sufficiently contemporaneous evidence to show that obscenity, too, was outside the protection intended for speech and press. [*Gertz*, 418 US at 381-386 (WHITE, J., dissenting) (footnotes omitted).]

## B. *NEW YORK TIMES* AND ITS PROGENY

With that historical backdrop in mind, where are we today? The United States Supreme Court issued its seminal decision in *New York Times* in 1964. While seemingly narrow in scope (insofar as it applied only to defamation claims brought by public officials relating to criticism of their official conduct), it opened the door to the federalization of defamation law and to the all-too-typical result: a creeping progression by which the exception becomes the all-encompassing rule.

*New York Times* was premised on a desire to guarantee citizens, in the course of debating public issues, a right to criticize their elected officials on matters of official conduct. *Id.*, 376 US at 270-273. The Court concluded that a "rule compelling the critic of official conduct to guarantee the truth of all his factual assertions . . . dampens the vigor and limits the variety of public debate," and is therefore "inconsistent with the First and Fourteenth Amendments." *Id.* at 279. The Court thus adopted—in those limited circumstances—an "actual malice" test:

The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. [*Id.* at 279-280.]

Within three years, the Court had extended that test to apply not only to public officials on matters of official conduct, but to "public figures." See *Curtis Publishing Co v Butts* (and its companion case, *Associated Press v Walker*), 388 US 130; 162; 87 S Ct 1975; 18 L Ed 2d 1094 (1967). More accurately, Justice HARLAN's lead opinion in *Curtis Publishing* (in which only a plurality—four—of the Justices joined), appeared to announce an entirely new test applicable to an undefined set of "public figures":

We consider and would hold that a "public figure" who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, *on a showing of highly unreasonable conduct constituting an extreme departure from the standard of investigation and reporting ordinarily adhered to by responsible publishers*. [*Id.* at 155 (emphasis added).]

The lead opinion in *Curtis Publishing* referred to " 'public figures' under ordinary tort rules," *Curtis Publishing*, 388 US at 154, and described that one of the named plaintiffs (the athletic director and former head football coach of a public university) "may have attained that

status by position alone," and that the other named plaintiff (a former general who had "taken command of the violent crowd and had personally led a charge against federal marshals sent there to effectuate the court's decree and to assist in preserving order") may have done so "by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy." *Id.* at 140, 155.

A majority of the Court (i.e., the other five Justices) subscribed to the pertinent aspects of Chief Justice WARREN's concurring-in-the-result opinion; instead of adopting the new test proposed by the lead opinion, the Court thereby effectively extended the *New York Times* "actual malice" standard to "public figures":

> Mr. Justice HARLAN's opinion departs from the standard of *New York Times* and substitutes in cases involving 'public figures' a standard that is based on 'highly unreasonable conduct' and is phrased in terms of 'extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers' (ante, p. 1991). I cannot believe that a standard which is based on such an unusual and uncertain formulation could either guide a jury of laymen or afford the protection for speech and debate that is fundamental to our society and guaranteed by the First Amendment.

> To me, differentiation between "public figures" and "public officials" and adoption of separate standards of proof for each have no basis in law, logic, or First Amendment policy. . . . [I]t is plain that although they are not subject to the restraints of the political process, "public figures," like "public officials," often play an influential role in ordering society. And surely as a class these "public figures" have as ready access as "public officials" to mass media of communication, both to influence policy and to counter criticism of their views and activities. Our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of "public officials." The fact that they are not amenable to the restraints of the political process only underscores the legitimate and substantial nature of the interest, since it means that public opinion may be the only instrument by which society can attempt to influence their conduct.

> I therefore adhere to the *New York Times* standard in the case of "public figures" as well as "public officials." It is a manageable standard, readily stated and understood, which also balances to a proper degree the legitimate interests traditionally protected by the law of defamation. . . . [T]he *New York Times* standard is an important safeguard for the rights of the press and public to inform and be informed on matters of legitimate interest. Evenly applied to cases involving "public men"—whether they be "public officials" or "public figures"—it will afford the necessary insulation for the fundamental interests which the First Amendment was designed to protect. [*Curtis Publishing*, 388 US at 162-165 (WARREN, C.J., concurring in the result).]

The expansion of the *New York Times* standard did not end there. For example, in *Rosenbloom v Metromedia, Inc*, 403 US 29; 92 S Ct 1811; 29 L Ed 2d 296 (1971), abrogated by

*Gertz*, 418 US at 345-347, a four-member plurality of a once-again fractured Court[1] extended the *New York Times* standard to *private* persons when the allegedly defamatory falsehoods concerned matters of general or public interest. *Id*. at 52 ("We thus hold that a libel action . . . by a private individual . . . for a defamatory falsehood in a newscast relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false of not.") (footnote omitted).[2]

As noted, the Court in *Gertz* later rejected the *Rosenbloom* plurality's approach with regarding to *liability* for defamation of private individuals; but, in doing so, it did preclude liability absent a showing of "fault." See *Gertz*, 418 US at 347 ("We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."). Further, it limited the *damage* recovery available to private plaintiffs absent a showing under the "actual malice" standard. *Gertz*, 418 US at 349 ("we hold that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth").

The Court in *Gertz* expanded upon the *Curtis Publishing* description of public figures, stating:

> Respondent's characterization of petitioner as a public figure raises a different question. That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions. [*Id.* at 351.]

The latter category of "public figures" has come to be known as that of a "limited-purpose public figure." See, e.g., *Wolston v Reader's Digest Ass'n, Inc*, 443 US 157, 165-166; 99 S Ct 2701; 61 L Ed 2d 450 (1979).

Dissenting in *Gertz*, Justice WHITE (who had joined the Court's opinion in *New York Times*) decried the Court's departure from the historical perspective of the First Amendment in relation to defamation law:

> The Court could not accept the generality of this historic view in *New York Times Co. v. Sullivan*, *supra*. There the Court held that the First Amendment was intended

---

[1]  Justice DOUGLAS did not participate. The eight participating Justices issued four separate opinions, ranging from declining a further intrusion of *New York Times* into state defamation law to affording the news media absolute immunity from liability for defamation.

[2] This standard of the plurality opinion was later adopted by many states and lower courts. See *Gertz*, 418 US at 379 and n 10 (WHITE, J., dissenting).

to forbid actions for seditious libel and that defamation actions by public officials were therefore not subject to the traditional law of libel and slander. If these officials (and, later, public figures occupying semiofficial or influential, although private, positions) were to recover, they were required to prove not only that the publication was false but also that it was knowingly false or published with reckless disregard for its truth or falsity. This view that the First Amendment was written to forbid seditious libel reflected one side of the dispute that reged [sic] at the turn of the nineteenth century and also mirrored the views of some later scholars.

The central meaning of *New York Times*, and for me the First Amendment as it relates to libel laws, is that seditious libel—criticism of government and public officials—falls beyond the police power of the State. 376 U.S., at 273-276, 84 S.Ct., at 722-724. In a democratic society such as ours, the citizen has the privilege of criticizing his government and its officials. But neither *New York Times* nor its progeny suggests that the First Amendment intended in all circumstances to deprive the private citizen of his historic recourse to redress published falsehoods damaging to reputation or that, contrary to history and precedent, the Amendment should now be so interpreted. Simply put, the First Amendment did not confer a "license to defame the citizen." W. Douglas, The Right of the People 36 (1958).

I do not labor the foregoing matters to contend that the Court is foreclosed from reconsidering prior interpretations of the First Amendment. But the Court apparently finds a clean slate where in fact we have instructive historical experience dating from long before the first settlors, with their notions of democratic government and human freedom, journeyed to this land. Given this rich background of history and precedent and because we deal with fundamentals when we construe the First Amendment, we should proceed with care and be presented with more compelling reasons before we jettison the settled law of the States to an even more radical extent. [*Gertz*, 418 US at 386-388 (WHITE, J., dissenting).]

III. APPLICATION

As outlined in the majority opinion, we have, of course, decided this case under existing law—such as it is. And I agree entirely with the majority's analysis of plaintiff's defamation-by-implication claim, with the clarification that the majority provides, i.e., that in applying the actual malice test in the context of a defamation-by-implication claim, either knowledge *or recklessness* satisfies the requirement that the defendant have intended the implication. I further note that I have difficulty discerning how plaintiff "voluntarily inject[ed] himself or [was] drawn into a particular public controversy," *Gertz*, 418 US at 351, so as to become a limited-purpose public figure. Moreover, I have concerns that, by virtue of the progression of the law that I have described, essentially everyone is now at least a limited-purpose public figure, such that the *New York Times* exception has indeed swallowed the rule.[3] That said, inasmuch as plaintiff does not contest his limited-purpose-public-figure status, I will not address the issue further.

---

[3] As one example of just how far this progression has apparently advanced, the plaintiff in *Ireland v Edwards*, 230 Mich App 607; 584 NW2d 632 (1998), was found to be—and indeed stipulated

## III.  WHERE DO WE GO FROM HERE?

As noted, and while we have resolved this case on the basis of existing law, I have serious concerns about the state of the law in this area, both with regard to its progressive deviation from the historical underpinnings of both the common law of defamation and the constitutional jurisprudence of the First Amendment, and with regard to its continuing applicability in the modern world.  I therefore join Justice THOMAS and Justice GORSUCH in calling for the United States Supreme Court to take a fresh look at the jurisprudence in this area.  As Justice THOMAS recently stated in *Berisha v Lawson*, __ US ___, ___; 141 S Ct 2424, 2424-2425; 210 L Ed 2d 991 (2021); (THOMAS, J., dissenting from the denial of certiorari):

> [Petitioner] now asks this Court to reconsider the 'actual malice' requirement as it applies to public figures.  As I explained recently, we should. . . .
>
> This Court's pronouncement that the First Amendment requires public figures to establish actual malice bears "no relation to the text, history, or structure of the Constitution." . . .  In fact, the opposite rule historically prevailed: "[T]he common law deemed libels against public figures to be . . . more serious and injurious than ordinary libels." *McKee* [*v Cosby*], 586 U.S. [___] at ___; 139 S. Ct [675]at 679[; 203 L Ed 2d 247 (2019)] (opinion of THOMAS, J.).
>
> \* \* \*
>
> The lack of historical support for this Court's actual-malice requirement is reason enough to take a second look at the Court's doctrine.  Our reconsideration is all the more needed because of the doctrine's real-world effects.  Public figure or private, lies impose real harm. . . .
>
> The proliferation of falsehoods is, and always has been, a serious matter.  Instead of continuing to insulate those who perpetrate lies from traditional remedies like libel suits, we should give them only the protection the First Amendment requires.

And as Justice GORSUCH, also dissenting from the denial of certiorari, poignantly added:

> At the founding, the freedom of the press generally meant the government could not impose prior restraints preventing individuals from publishing what they wished.  But none of that meant publishers could defame people, ruining careers or lives, without consequence.  Rather, those exercising the freedom of the press had a responsibility to try to get the facts right—or, like anyone else, answer in tort for the injuries they caused.
>
> This principle extended far back in the common law and far forward into our Nation's history.  As Blackstone put it, "[e]very freeman has an undoubted right to lay what sentiments he pleases before the public," but if he publishes falsehoods

---

that she was—a limited-purpose public figure.  She was the mother of a child who was the subject of a custody action.  *Id*. at 615.

"he must take the consequence of his own temerity." 4 W. Blackstone, Commentaries on the Laws of England 151–152 (1769). Or as Justice Story later explained, "the liberty of the press do[es] not authorize malicious and injurious defamation." *Dexter v. Spear*, 7 F.Cas. 624 (No. 3,867) (CCDRI 1825).

This was "[t]he accepted view" in this Nation for more than two centuries. . . . As a rule, that meant all persons could recover damages for injuries caused by false publications about them. . . .

This changed only in 1964. . . . Since 1964, however, our Nation's media landscape has shifted in ways few could have foreseen. . . . The effect of these technological changes on our Nation's media may be hard to overstate. Large numbers of newspapers and periodicals have failed. . . . Network news has lost most of its viewers. . . . With their fall has come the rise of 24-hour cable news and online media platforms that "monetize anything that garners clicks." . . . No doubt, this new media world has many virtues—not least the access it affords those who seek information about and the opportunity to debate public affairs. At the same time, some reports suggest that our new media environment also facilitates the spread of disinformation. . . . A study of one social network reportedly found that "falsehood and rumor dominated truth by every metric, reaching more people, penetrating deeper . . . and doing so more quickly than accurate statements." . . . All of which means that "the distribution of disinformation"—which "costs almost nothing to generate"—has become a "profitable" business while "the economic model that supported reporters, fact-checking, and editorial oversight" has "deeply erod[ed]." . . .

It's hard not to wonder what these changes mean for the law. In 1964, the Court may have seen the actual malice standard as necessary "to ensure that dissenting or critical voices are not crowded out of public debate. . . . But if that justification had force in a world with comparatively few platforms for speech, it's less obvious what force it has in a world in which everyone carries a soapbox in their hands. Surely, too, the Court in 1964 may have thought the actual malice standard justified in part because other safeguards existed to deter the dissemination of defamatory falsehoods and misinformation. . . . In that era, many major media outlets employed fact-checkers and editors, . . . and one could argue that most strived to report true stories because, as "the public gain[ed] greater confidence that what they read [wa]s true," they would be willing to "pay more for the information so provided." . . . Less clear is what sway these justifications hold in a new era where the old economic model that supported reporters, fact-checking, and editorial oversight is disappearing.

These questions lead to other even more fundamental ones. When the Court originally adopted the actual malice standard, it took the view that tolerating the publication of *some* false information was a necessary and acceptable cost to pay to ensure truthful statements vital to democratic self-government were not inadvertently suppressed. . . . But over time the actual malice standard has evolved from a high bar to recovery into an effective immunity from liability. . . .

The bottom line? It seems that publishing *without* investigation, fact-checking, or editing has become the optimal legal strategy. . . . Under the actual malice regime as it has evolved, "ignorance is bliss." . . . Combine this legal incentive with the business incentives fostered by our new media world and the deck seems stacked against those with traditional (and expensive) journalistic standards—and in favor of those who can disseminate the most sensational information as efficiently as possible without any particular concern for truth. . . . What started in 1964 with a decision to tolerate the occasional falsehood to ensure robust reporting by a comparative handful of print and broadcast outlets has evolved into an ironclad subsidy for the publication of falsehoods by means and on a scale previously unimaginable. . . . If ensuring an informed democratic debate is the goal, how well do we serve that interest with rules that no longer merely tolerate but encourage falsehoods in quantities no one could have envisioned almost 60 years ago?

Other developments raise still more questions. In 1964, the Court may have thought the actual malice standard would apply only to a small number of prominent governmental officials whose names were always in the news and whose actions involved the administration of public affairs. Here again, the Court may have thought that allowing some falsehoods about these persons and topics was an acceptable price to pay to ensure truthful statements vital to democratic self-government were not inadvertently suppressed. Perhaps the Court weighed the costs and benefits similarly when it extended the actual malice standard to the "pervasively famous" and "limited purpose public figures."

But today's world casts a new light on these judgments as well. Now, private citizens can become "public figures" on social media overnight. Individuals can be deemed "famous" because of their notoriety in certain channels of our now-highly segmented media even as they remain unknown in most. . . .

Again, it's unclear how well these modern developments serve *Sullivan*'s original purposes. Not only has the doctrine evolved into a subsidy for published falsehoods on a scale no one could have foreseen, it has come to leave far more people without redress than anyone could have predicted. And the very categories and tests this Court invented and instructed lower courts to use in this area—"pervasively famous," "limited purpose public figure"—seem increasingly malleable and even archaic when almost anyone can attract some degree of public notoriety in some media segment. Rules intended to ensure a robust debate over actions taken by high public officials carrying out the public's business increasingly seem to leave even ordinary Americans without recourse for grievous defamation. At least as they are applied today, it's far from obvious whether *Sullivan*'s rules do more to encourage people of goodwill to engage in democratic self-governance or discourage them from risking even the slightest step toward public life.

 . . . [G]iven the momentous changes in the Nation's media landscape since 1964, I cannot help but think the Court would profit from returning its attention, whether in this case or another, to a field so vital to the "safe deposit" of our liberties.

[*Berisha*, ___ US at ___; 141 S Ct at 2426-2430 (GORSUCH, J., dissenting from the denial of certiorari).]

I agree.

## IV.  CONCLUSION

For these reasons stated, and for the reasons stated by the majority, I concur in affirming in part and reversing in part the trial court's order granting summary disposition in favor of defendants, and in remanding for further proceedings consistent with this opinion.

/s/ Mark T. Boonstra